631 A.2d 77

**ALLIED VENDING, INC. et al.**

v.

**The CITY OF BOWIE, Maryland et al.**

**No. 108, Sept. Term, 1992.**

Court of Appeals of Maryland.

Sept. 17, 1993.

As Corrected on Denial of Reconsideration Oct. 29, 1993.

Bruce C. Bereano, argued and on brief (Kevin Reynolds, on brief), Annapolis, for petitioner.

Angus R. Everton, argued (Roy L. Mason and Terrence C. McAndrews, Mason, Ketterman & Morgan, on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

We issued a writ of certiorari in this case to determine the validity of ordinances enacted by two municipalities which restrict the placement of state-licensed cigarette vending machines to locations which are not generally accessible to minors. The Circuit Court for Prince George's County determined that the ordinances were valid. We shall hold that the municipal ordinances are pre-empted by state law, more specifically, the cigarette licensing scheme provided by Maryland Code (1957, 1991 Cum.Supp.), Article 56, §§ 607 through 631, and therefore, shall reverse.

I.

On July 23, 1990, the City of Takoma Park enacted Ordinance No. 1990–39, which repealed and reenacted with amendments, Chapter 10B of the Takoma Park Code ("Takoma Park ordinance"). As enacted, § 10B–15(a) provides that "[n]o person shall sell tobacco products through a vending machine without first obtaining a permit for the placement of a ciga-

rette vending machine in compliance with the provisions of [this ordinance]." [1]   Section 10B–16 provides:

"(a) No permit shall be issued for placement of a cigarette vending machine except in locations which are not generally accessible to or frequented by minors, such as bars, cocktail lounges, liquor stores, and private clubhouses for members of fraternal or civic organizations not operated as public businesses or open to the general public.

"(b) Notwithstanding the foregoing, no permit shall be issued for a cigarette vending machine which is:

(1) Located in a coat room, restroom, unmonitored hallway, outer waiting area, or similar unattended or unmonitored area of a bar, cocktail lounge, liquor store, private clubhouse or other place to which minors are not generally permitted access; or

(2) Accessible to the public when the establishment is closed.

"(c) The burden of showing that a location is not generally accessible to or frequented by minors shall be on the person who is seeking a permit for a cigarette vending machine."

Section 10B–17 requires the permit to be posted on, or conspicuously in the immediate vicinity of, the cigarette vending machine.   Under Section 10B–34(f), a violation of the Takoma Park ordinance by either the cigarette vending machine vendor or the person in charge of any area in which a cigarette vending machine is located, subjects the violator to a

---

1.  Section 10B–15(b) requires cigarette vending machine permits to be issued annually, requires a separate permit for each machine, and requires a fee of $25.00.   Section 10B–15(c) requires applications for cigarette vending machine permits to be made to the City Clerk on forms furnished by the City Clerk and in accordance with regulations established by the City Administrator.   Section 10B–15(d) provides that the City Clerk was to notify all current holders of county and state licenses which authorize those licensees to sell cigarettes through cigarette vending machines located within Takoma Park.   Section 10B–15(e) provides that a current state-licensed cigarette vending machine licensee was not required to obtain a Takoma Park permit until the expiration of its current license.

$75.00 fine for the first day there is a violation and to a $150.00 fine for each subsequent day there is a violation.

The purposes for the enactment of these provisions were set forth in the ordinance's preamble as follows:

"WHEREAS, the Council wishes to discourage minors from experimenting with smoking and to make tobacco products less accessible to minors by restricting where cigarette vending machines are placed . . . and . . .

"WHEREAS, smoking by minors is detrimental to the public health and contrary to public policy; and . . .

"WHEREAS, smoking has been linked to lung cancer, respiratory disease and heart disease; and . . .

"WHEREAS, the Surgeon General has determined that smoking is the leading cause of preventable death; and . . .

"WHEREAS, nicotine in tobacco has been found by the Surgeon General to be a powerfully addictive drug and it is therefore important to prevent minors from using nicotine until they are mature and capable of making an informed and rational decision; and

"WHEREAS, everyday more than 3,000 minors begin smoking; and

"WHEREAS, one-half of all smokers began smoking before the age of 18; and

"WHEREAS, Article 27, Section 404 of the Annotated Code of Maryland prohibits the sale of tobacco products to minors; and

"WHEREAS, despite the Maryland state law, access by minors to tobacco products is a major problem; and

"WHEREAS, cigarette vending machines are often located in unattended or unmonitored areas where minors can readily purchase tobacco products; and

"WHEREAS, a City permit requirement which would allow the placement of cigarette vending machines only in establishments which are not generally accessible to or

frequented by minors or are not open to the general public would help restrict the access of minors to tobacco products; and

"WHEREAS, a City cigarette vending machine permit is necessary for regulatory purposes to more effectively restrict the access of minors to tobacco products in the interest of public health."

On April 15, 1991, the City of Bowie enacted ordinance 0–1–91 ("Bowie ordinance"), which added a new section, § 11–4, to the City of Bowie Code and which is nearly identical to the Takoma Park ordinance. After stating the purposes for its enactment, which are similar to those provided in the preamble to the Takoma Park ordinance, § 11–4(D)(1) of the Bowie ordinance provides that a cigarette vending machine "shall not be placed or permitted to remain in the city in a public place unless a license for its location has been obtained from the city." [2] Section 11–4(E) provides:

"(E) License Restrictions.

(1) No license shall be issued for placement of a vending machine except in locations which are not generally accessible to or frequented by minors, including by way of example, bars, cocktail lounges, and private clubhouses for mem-

---

**2.** The Bowie ordinance contains administrative and procedural requirements that mirror the Takoma Park ordinance. For instance, under the Bowie ordinance a license is required annually and a separate license is required for each vending machine location, § 11–4(D)(2); applications for licenses are to be made by owners or operators to the city manager on forms furnished by the city, § 11–4(D)(3); a fee of $25.00 is to be charged for each license and renewal thereof, § 11–4(D)(4); the application needs to include such information as is necessary for the city to determine where the vending machine will be located and that the requested location is not generally accessible to minors, § 11–4(D)(5); in addition, plans or drawings and a statement of how the location will be monitored or controlled to exclude access to minors are required, *id.;* and the license is required to be displayed on the vending machine or posted conspicuously in its immediate vicinity, § 11–4(F). Under the Bowie ordinance, if distributions to minors occur from licensed vending machines, the city may require licensees to relocate the machine and apply to revise the license. § 11–4(G).

bers of fraternal or civic organizations not operated as public businesses or open to the general public.

(2) Notwithstanding the foregoing, no license shall be issued for a vending machine which is:

(a) located in an unmonitored coat room, restroom, outer waiting area, or similar unattended or unmonitored area of such establishments; or

(b) accessible to the public when the establishment at which the vending machine is located is closed.

(c) located in an area which is less than twenty five (25) feet from any point of public ingress to or public egress from the establishment."

Under § 11–4(H), the City Manager may revoke or refuse to renew a license for repeated distributions of cigarettes to minors from a vending machine or for placing a vending machine in a public place without a license. Under the Bowie ordinance, the failure to obtain or renew a license, placing a vending machine in an unlicensed location, or the failure to properly display the license is a violation punishable by a fine of $100.00 for the first offense and $400.00 for each subsequent offense. §§ 11–4(I) and 11–5.

## II.

On September 12, 1991, appellants, Allied Vending, Inc. ("Allied") and D.C. Vending Co., Inc. ("D.C. Vending") filed a declaratory judgment action in the Circuit Court for Prince George's County against the City of Bowie, City of Takoma Park, and Alexander Williams, Jr., the State's Attorney for Prince George's County,[3] seeking declaratory relief that the ordinances were invalid and requesting both interlocutory and permanent injunctive relief prohibiting the enforcement of the

---

**3.** The State's Attorney for Prince George's County, who is authorized to prosecute municipal infractions by Maryland Code (1957, 1990 Repl. Vol.), Article 23A, § 3(b)(15), was dismissed from the action pursuant to a stipulation by the parties, whereby he agreed to be bound by the judgment rendered in this action.

ordinances.[4]   In their complaint, the vendors asserted that the ordinances were invalid for the following reasons: 1) they are pre-empted by state law;  2) they are in conflict with state law; 3) they affect the entire state and thus are not local laws;  4) they were not enacted pursuant to any express authority granted to a municipal corporation;  5) they are pre-empted by federal law;  6) they are in conflict with federal law;  7) they impair the vendor's contracts;  8) they deny the vendors equal protection of the law;  and 9) they are void for vagueness and violate other due process guarantees.

Following a two-day trial, the circuit court filed an extensive written opinion rejecting each of the vendors' arguments and ruling that both ordinances were valid and enforceable.  After appealing to the Court of Special Appeals, the vendors petitioned this Court for a writ of certiorari, which we issued prior to any consideration of the case by the intermediate appellate court, 328 Md. 741, 616 A.2d 904.

Because we shall hold that the ordinances are pre-empted by state law, we will not address any of the vendors' other arguments.  Before we discuss pre-emption, however, it would be useful to explain the background behind this dispute and the state laws governing the licensing of cigarette vending machines.

### A.

The vendors, Allied and D.C. Vending, own and operate cigarette vending machines.  The vendors are licensed by the State of Maryland to operate cigarette vending machines in the Cities of Bowie and Takoma Park.  At the time of the trial, Allied was licensed by the State to operate cigarette vending machines in several locations in Bowie, including Bob's Big Boy Restaurant, Bowie Golf and Country Club, and Pizza Cafe.  The cigarette vending machines were operated in each location pursuant to an oral agreement with the owners

---

**4.** The request for interlocutory injunctive relief became moot when the municipalities agreed not to enforce the ordinances against these vendors pending a resolution of the action in the circuit court.

of each of the premises, terminable at the will of either party. Under the agreement, Allied was required to pay the owners a monthly commission on each pack of cigarettes sold, varying from 5 cents per pack at the Bowie Golf and Country Club, 17 cents per pack at the Pizza Cafe, and 37 cents per pack at Bob's Big Boy Restaurant. Allied's President, Paul Oh, testified that its profit from a pack of cigarettes is approximately 50 cents and that approximately 63 percent of Allied's total business is derived from sales through cigarette vending machines.

D.C. Vending operates a cigarette vending machine at the New Hampshire Motor Inn in Takoma Park under a similar oral agreement. William John Deoudes, D.C. Vending's Vice President, testified that it pays the owner a monthly commission of 15 cents on each pack sold and receives a profit of approximately 30 cents per pack. He also testified that approximately 85 percent of D.C. Vending's business is derived from sales through cigarette vending machines.

With regard to the location of the cigarette vending machines, the trial court found as a fact that all of the cigarette vending machines involved in this case were located in places which were generally accessible to minors.

### B.

Prior to the enactment of the ordinances, the licensing of cigarette vending machines was accomplished exclusively in accordance with Md.Code (1957, 1991 Cum.Supp.), Article 56, §§ 607 through 631.[5] Sections 607 through 631 are comprehensive provisions governing the appropriate licenses necessary to sell cigarettes in Maryland at wholesale, retail, over-

---

5. Effective October 1, 1992, Chapter 4 of the Acts of 1992 added a new article to the Annotated Code of Maryland known as the "Business Regulation Article" and recodified without substantive change the cigarette licensing provisions in Title 16 of the Business Regulation Article. The relevant provisions were transferred to Title 16 of the Business Regulation Article without substantive change. Hereinafter all statutory references are to Md.Code (1957, 1991 Cum.Supp.), Article 56, unless otherwise specified.

the-counter, and through cigarette vending machines. In order to operate a cigarette vending machine within this State, a vendor must obtain two licenses for each machine.

If a vendor operates cigarette vending machines on 40 or more premises, the vendor is required to obtain a license to engage in the business of a cigarette vending machine operator ("cigarette vending machine operator's license") from the Comptroller of the Treasury for a flat fee of $250.00. §§ 610(d), (f), (*o* ), 611(a), 612(c), 613(a)(2). An application for a cigarette vending machine operator's license is made to the Comptroller on the form and containing the information that the Comptroller requires. § 612(c).

If a vendor operates cigarette vending machines on less than 40 premises, the vendor is required to obtain a license to engage in the business of a cigarette retailer ("cigarette retailer's license") from the clerk of the circuit court for the county where the cigarette vending machine is to be located.[6] §§ 610(b), (f), (h), (*l* ), 611(a)(2), 612(a), 613(b). For a vendor operating cigarette vending machines on less than 40 premises, a cigarette retailer's license is required for each cigarette vending machine and costs $3.00. § 612(a). An application for a cigarette retailer's license is made to the clerk of the circuit court on the form the clerk requires and containing the information the Comptroller requires. *Id.*

In addition to obtaining either a cigarette vending machine operator's license or a cigarette retailer's license for each cigarette vending machine, a vendor is required to obtain for each vending machine a license to make retail sales of cigarettes ("county license") from the clerk of the circuit court for the county where each cigarette vending machine is located for a fee of $25.00.[7] §§ 612(a), (c), 631. The county license,

---

**6.** A cigarette retailer's license is required to sell cigarettes to a consumer regardless of whether the sale is effected through a cigarette vending machine or over-the-counter. §§ 610(b), 611(a)(2).

**7.** A county license is required to sell cigarettes to a consumer regardless of whether the sale is effected through a cigarette vending machine or over-the-counter. § 631(a).

required to make retail sales of cigarettes, has been required since 1890. *See* Chapter 91 of the Acts of 1890. The cigarette vending machine operator's license and the cigarette retailer's license have been required since 1956. *See* Chapter 90 of the Acts of 1956.

The Comptroller, in Title 03, Subtitle 02, Chapter 03 of COMAR, has promulgated regulations governing the information required in the applications for all types of cigarette licenses, including the requirement that the applicant provide the addresses where cigarette vending machines are located. COMAR 03.02.03 provides in relevant part:

".03 **Applications for Cigarette Licenses.**

A. Applications for a retailer's cigarette license or licenses shall show the name and address of the place where cigarettes are sold.

B. Applications for more than one cigarette license shall be accompanied by a list of locations stating names and addresses where cigarettes are sold.

C. Applications by vending machine operators . . . for a [cigarette vending machine operator's license] shall be accompanied by a list showing:

(1) Names and addresses where cigarette vending machines are located;

(2) The number of machines at each location; and

(3) The address of the established place of business maintained by the applicant for the purchase of cigarettes, including but not limited to, the maintenance of warehousing facilities for the storage and distribution of cigarettes.

.04 **Record Keeping and Licensing.**

A. Holders of any cigarette license shall keep and maintain available for inspection during business hours, for a period of 2 years, the following:

(1) All invoices and bills of lading;

(2) All records covering all purchases and sales of cigarettes; and

(3) All records of merchandise sold in connection with cigarettes.

B.   The records in § A of this regulation shall be subject to inspection wherever they may be found. . . .

H.   A vending machine operator holding a cigarette license shall notify the Comptroller within 10 days of the following:

(1) Discontinuance of a location;  or

(2) Addition of a new location."

Other provisions of Article 56 govern the scope of the licenses, § 614, the term and renewal of the licenses, §§ 615 and 631(f), the assignment, transfer and surrender of the license, § 616, and the denial, suspension and revocation of licenses, §§ 618–621.   In addition, § 617 provides:

"*(a)  License display.*—A licensee shall display a cigarette license in the manner that the Comptroller requires by regulation.

*(b)  Cigarette display and vending machine label requirements.*—A licensee who sells cigarettes through a vending machine shall:

(1) Position each package of cigarettes in a vending machine so that the tax stamps required in § 12–304 of the Tax–General Article [8] are visible when the package is in an area of the vending machine that allows the package to be seen;

(2) Identify each vending machine:

(i) With a conspicuous label that states the licensee's name, address, and telephone number;  and

---

**8.**   Under Md.Code (1988, 1992 Cum.Supp.), §§ 2–1601 through 2–1605 and 12–101 through 12–305 of the Tax–General Article, a tobacco tax is imposed on cigarettes.   Licensed wholesalers pay the tobacco tax to the Comptroller and affix tax stamps to a package of cigarettes as evidence that the tobacco tax has been paid.   §§ 12–101, 12–301 through 12–304.   The tobacco tax is 36 cents for each pack of twenty cigarettes. § 12–105(2).   The revenue generated from the tobacco tax, after deduction of the cost of administering the tobacco tax laws, is distributed to the general fund of the state.   §§ 2–1601 through 2–1605.

(ii) In the manner that the Comptroller requires by regulation; and

(3) Display, in the manner that the Comptroller requires by regulation, a conspicuous label that states the age requirement and penalty as provided under Article 27, §§ 404 and 405 of the Code."

Section 617(3) is a recent addition to the section, added by Chapter 301 of the Acts of 1989. Chapter 301 raised the minimum age of a person, from 16 years to 18 years of age, to whom it is lawful to sell cigarettes or other tobacco products. *See* Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 404.[9] Chapter 301 also added Article 27, § 405(b), which exempts from criminal penalties a cigarette machine vendor from whose machine a minor has purchased cigarettes if the vendor complies with the display requirements of § 617(b)(3).[10] Article 27, § 405(b) provides:

"*(b) Exceptions.*—If the requirements of Article 56, § 617(b)(3) of the Code are satisfied, the provisions of subsection (a) of this section do not apply to the owner of a tobacco product vending machine or any other person exercising control over a tobacco product if a person under 18 has purchased a tobacco product from a vending machine."

---

9. Section 404 of Article 27 provides:

"(a) *In general.*—It shall not be lawful for any dealer, vendor or other person or persons or body corporate engaged in the manufacture of cigars, cigarettes, tobacco, or smokeless tobacco, or in any occupation in which the buying or selling of said goods, wares and merchandise shall constitute the whole or any part of his, her, its or their occupation, to sell, barter or give any cigar or cigars, cigarette or cigarettes, smoking or chewing tobacco, or smokeless tobacco to any individual under the age of 18 years, unless such individual is acting solely as the agent of his employer; nor shall it be lawful for any person not a dealer to purchase for any individual under the age of 18 years any cigar or cigars, cigarette or cigarettes, smoking or chewing tobacco, or smokeless tobacco."

Since the enactment of Chapter 371 of the Acts of 1886, which prohibited the sale of cigarettes and other tobacco products to minors under fourteen years of age, the State has set the minimum age requirement for the lawful sale of cigarettes and tobacco products.

10. The criminal penalty for violating Article 27, § 404 is a fine not to exceed one hundred dollars for each offense. Art. 27, § 405(a).

Under the authority granted in § 617, the Comptroller has promulgated regulations governing the display of cigarette licenses. COMAR 03.02.03.04 provides in relevant part:

"D. Cigarette Vending Machine Requirements.

(1) A licensee who sells cigarettes at retail through a vending machine shall display on each machine:

(a) A label that indicates the licensee's name, address, and telephone number; and

(b) The label provided by the Comptroller that states the:

(i) Age requirement for the purchase of cigarettes, and

(ii) Penalty as provided by Article 27, §§ 404 and 405.

(2) Operators of cigarette vending machines not covered in § D(1)(a) shall display the retailer's cigarette license on the machines they operate.

E. Other holders of retailer's cigarette licenses shall visibly display the license on the premises where cigarettes are sold."

The cigarette license fees paid to the Comptroller are used to administer the licensing scheme embodied in §§ 607 through 631 and enforcement of the Cigarette Sales Below Cost Act.[11] § 624. Section 628(a) provides:

"[t]he Comptroller shall seal a [cigarette] vending machine to prevent the sale or removal of cigarettes from the vending machine if:

(1) the tobacco tax stamp is not visible on packages of cigarettes in the vending machine, as required in § 617 of this subtitle; or

(2) The vending machine is not labeled as required under § 617...."

---

11. The Maryland Cigarette Sales Below Cost Act, Md.Code (1990 Repl. Vol.), §§ 11–501 through 11–510 of the Commercial Law Article, regulates the minimum wholesale and retail prices at which cigarettes may be sold.

There are numerous criminal offenses punishable by fines or jail, which are provided in the licensing scheme. These provisions include operating without a cigarette vending machine operator's license or a cigarette retailer's license, § 630(a), operating without a county license, § 631(j), violating regulations issued by the Comptroller, including the regulations governing display of cigarette licenses, § 631(k), improper display of the county license, 631(g), and willfully tampering with a seal placed on a cigarette vending machine by the Comptroller. § 630(b). These provisions are in addition to those which allow the Comptroller to deny a license to an applicant, reprimand any licensee, or suspend or revoke a license. §§ 618, 631(h).

Under Md.Code (1990 Repl.Vol.), § 11–507 of the Commercial Law Article and Md.Code (1988), § 2–107 of the Tax–General Article, the Comptroller is given authority to enforce the Cigarette Sales Below Cost Act and the tobacco tax laws of Title 12 of the Tax–General Article. The record indicates that during fiscal year 1990, there were over 3,000 inspections of retail outlets, including inspections of cigarette vending machines. Marion E. Schanze, Assistant Director of the Alcohol and Tobacco Tax Division of the Comptroller of the Treasury, testified that the enforcement unit of the Comptroller's office conducts inspections of approximately ten percent of the cigarette vending machines for each cigarette vending machine operator's license issued by the Comptroller and makes spot inspections of many cigarette retailers. Although there is no express provision for enforcement of the warning label requirement, it is clear from the record that this warning label requirement, imposed by both § 617(b)(3) and COMAR 03.02.03.04D, is enforced by the Comptroller. For as stated previously, it is a misdemeanor to fail to comply with a regulation issued by the Comptroller, § 631(k), (l) and subjects the vendor or other person exercising control over the vending machine to a fine if a minor purchases cigarettes from a vending machine that does not display the warning label. Art. 27, §§ 404, 405.

C.

The powers of incorporated municipalities are provided in Article XI–E of the Maryland Constitution and Article 23A of the Maryland Code. *Mayor of Forest Heights v. Frank,* 291 Md. 331, 342, 435 A.2d 425, 431 (1981). Under Article XI–E, § 3 of the Maryland Constitution, each municipal corporation in Maryland is vested with "the power and authority ... to amend or repeal an existing charter or local laws relating to the incorporation, organization, government, or affairs of said municipal corporation heretofore enacted by the General Assembly of Maryland, ... and to amend or repeal any charter adopted under the provisions of this Article." This authority is qualified by Article XI–E, § 6, of the Maryland Constitution which provides that "[a]ll charter provisions, or amendments thereto, adopted under the provisions of this Article, shall be subject to all applicable laws enacted by the General Assembly." Likewise, Maryland Code (1957, 1990 Repl.Vol.), Article 23A, § 2 provides:

"(a) The legislative body of every incorporated municipality in this State, except Baltimore City, by whatever name known, shall have general power to pass such ordinances not contrary to the Constitution of Maryland, public general law, or, except as provided in § 2B of this article, public local law as they may deem necessary in order to assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, to secure persons and property from danger and destruction, and to protect the health, comfort and convenience of the citizens of the municipality...."

Following this delegation of general power, Article 23A, § 2(b) grants certain express powers to municipal corporations and provides in relevant part:

"(b) In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers: ...

(32) To exercise the licensing authority granted in Article 56 and other provisions of the law.

(33) Subject to the limitations imposed under Article 24 of the Code, the Tax–General Article, and the Tax–Property Article, to establish and collect reasonable fees and charges:

(i) For the franchises, licenses, or permits authorized by law to be granted by a municipal corporation...."

The enactment of Article 23A, § 2(b)(32) and (33) was an unambiguous response by the General Assembly to our decision in *Campbell v. City of Annapolis*, 289 Md. 300, 424 A.2d 738 (1981). In *Campbell*, we determined that a rental dwelling license fee imposed by the Annapolis City Code was invalid because the fee had not been expressly authorized by the General Assembly. In response to *Campbell*, the General Assembly enacted two identical bills as emergency legislation. Those bills added Article 23A, § 2(b)(32) and (33). *See Vytar Assocs. v. City of Annapolis*, 301 Md. 558, 561, 483 A.2d 1263, 1264–65 (1984); 67 Op.Att'y Gen. 307 (1982). Thus, subsections (32) and (33) enable municipal corporations to exercise the licensing authority granted in Article 56, and further, to establish and collect reasonable fees for the licenses and permits authorized in Article 56 to be granted by municipal corporations.

■ The ability of a municipal corporation to regulate businesses through licensing and permitting processes is circumscribed in part by Article 56, § 12. Section 12 provides in relevant part:

"Except as otherwise expressly provided in this article, no county, city or other political subdivision of this State shall require any person, firm or corporation to obtain a permit or license to transact in such county, city or other political subdivision any business or occupation for which it or he is required to obtain a State license under the provisions of this article, nor shall any county, city or other political subdivision of this State levy an occupational tax or fee upon such person, firm or corporation for transacting any such business or engaging in any such occupation for which such

State license is required. Notwithstanding the provisions of this section, any county, city or other political subdivision of this State may require permits or licenses to be obtained where necessary for regulatory purposes in the interest of the public health, safety or morals."

Although municipalities may require permits or licenses for regulatory purposes in the interest of the public health, safety or morals, this authority is "subject to all applicable laws enacted by the General Assembly." Md. Const. Art. XI–E, § 6. Moreover, ordinances passed pursuant to such authority are permissible as long as they are "not contrary to the Constitution of Maryland [or] public general law. . . ." Art. 23A, § 2(a). In short, if the General Assembly has pre-empted a certain field, such as the sale of cigarettes through cigarette vending machines, it is irrefutable that municipalities have no authority to legislate in that field.

### III.

■ We recognized in *Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 513 A.2d 893 (1986),

"[t]he doctrine of pre-emption is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field."

*Id.* at 324, 513 A.2d at 902. As we recently explained in *Talbot County v. Skipper,* 329 Md. 481, 487–88, 620 A.2d 880, 883 (1993), state law may pre-empt local law in one of three ways: 1) pre-emption by conflict,[12] 2) express pre-emption,[13] or

---

**12.** In *Skipper,* we explained that "[a] local ordinance is preempted by conflict when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." 329 Md. at 487 n. 4, 620 A.2d at 882–83 n. 4. *See also Boulden v. Mayor of Elkton,* 311 Md. 411, 535 A.2d 477 (1988); *Rockville Grosvenor, Inc. v. Montgomery County,* 289 Md. 74, 422 A.2d 353 (1980); *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 396 A.2d 1080 (1979); *County Council v. Investors Funding, Corp.,*

3) implied pre-emption. Over the last twenty-five years, we have frequently examined the concept of implied pre-emption. *Skipper, supra; Howard County v. Potomac Elec. Power Co.,* 319 Md. 511, 573 A.2d 821 (1990); *Board of Child Care of the Balt. Annual Conf. of the Methodist Church, Inc. v. Harker,* 316 Md. 683, 561 A.2d 219 (1989); *Ad + Soil, supra; National Asphalt Pavement Ass'n, Inc. v. Prince George's County,* 292 Md. 75, 437 A.2d 651 (1981); *Montgomery County Bd. of Realtors, Inc. v. Montgomery County,* 287 Md. 101, 411 A.2d 97 (1980); *McCarthy v. Board of Educ.,* 280 Md. 634, 374 A.2d 1135 (1977); *County Council v. Montgomery Ass'n, Inc.,* 274 Md. 52, 333 A.2d 596 (1975); *Mayor of Baltimore v. Sitnick,* 254 Md. 303, 255 A.2d 376 (1969). In *Sitnick,* we explained the theory of implied pre-emption:

"[W]e wish it understood that there may be times when the legislature may so forcibly express its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by occupation is compelled. . . ."

254 Md. at 323, 255 A.2d at 385.

■ Although there is no particular formula for determining whether the General Assembly intended to pre-empt by implication an entire area, *Skipper,* 329 Md. at 488, 620 A.2d

---

270 Md. 403, 312 A.2d 225 (1973); *Mayor of Baltimore v. Sitnick,* 254 Md. 303, 255 A.2d 376 (1969); *American Nat'l Bldg. & Loan Ass'n v. Mayor of Baltimore,* 245 Md. 23, 224 A.2d 883 (1966); *Heubeck v. Mayor of Baltimore,* 205 Md. 203, 107 A.2d 99 (1954); *Herman v. Mayor of Baltimore,* 189 Md. 191, 55 A.2d 491 (1947); *Eastern Tar Prods. Corp. v. State Tax Comm'n,* 176 Md. 290, 4 A.2d 462 (1939); *Billig v. State,* 157 Md. 185, 145 A. 492 (1929); *Rossberg v. State,* 111 Md. 394, 74 A. 581 (1909); *cf. Mayor of Forest Heights v. Frank,* 291 Md. 331, 435 A.2d 425 (1981) (municipal ordinance conflicting with county ordinance is pre-empted by conflict).

Because we shall hold that the ordinances in this case are pre-empted by implication, we will not address the vendors' argument concerning pre-emption by conflict.

**13.** *See Montgomery County v. Atlantic Guns, Inc.,* 302 Md. 540, 489 A.2d 1114 (1985); *Mayor of Baltimore v. Stuyvesant Ins. Co.,* 226 Md. 379, 174 A.2d 153 (1961).

In this case, the vendors concede there is no express preemption in the field of cigarette sales.

at 883; *Potomac Elec. Power Co.,* 319 Md. at 522–23, 573 A.2d at 827, and though our decisions have considered several factors, *Skipper,* 329 Md. at 488, 620 A.2d at 883, we have stated repeatedly that " ' '[t]he primary indicia of a legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated the field.' ' " *Skipper,* 329 Md. at 488, 620 A.2d at 883 (*quoting Potomac Elec. Power Co.,* 319 Md. at 523, 573 A.2d at 828 (*quoting Harker,* 316 Md. at 696–97, 561 A.2d at 226)); *Ad + Soil,* 307 Md. at 328, 513 A.2d at 904.

Among the secondary factors we have considered in determining whether pre-emption by implication exists are the following: 1) whether local laws existed prior to the enactment of the state laws governing the same subject matter, *Potomac Elec. Power Co.,* 319 Md. at 529, 573 A.2d at 830–31; *Harker,* 316 Md. at 698, 561 A.2d at 227; *Ad + Soil,* 307 Md. at 333, 513 A.2d at 906; *National Asphalt Pavement Ass'n,* 292 Md. at 79–80, 437 A.2d at 653; *Montgomery Ass'n,* 274 Md. at 60 n. 5, 333 A.2d at 600 n. 5; *Sitnick,* 254 Md. at 322, 255 A.2d at 385, 2) whether the state laws provide for pervasive administrative regulation, *Skipper,* 329 Md. at 489, 620 A.2d at 884; *National Asphalt Pavement Assoc.,* 292 Md. at 79, 437 A.2d at 653, 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed, *Skipper,* 329 Md. at 493, 620 A.2d at 886, *Montgomery Ass'n,* 274 Md. at 65, 333 A.2d at 603, 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, *Skipper,* 329 Md. at 492, 620 A.2d at 885; *Harker,* 316 Md. at 698, 561 A.2d at 226–27; *Ad + Soil,* 307 Md. at 326–28, 513 A.2d at 903–04, 5) whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field, *Potomac Elec. Power Co.,* 319 Md. at 525–28, 573 A.2d at 828–30; *Harker,* 316 Md. at 697–98, 561 A.2d at 227; *National Asphalt Pavement Ass'n.,* 292 Md. at 80, 437 A.2d at 653–54, 6) whether the particular aspect of the field sought to be regulated by the local government has been addressed by the state legislation, *Skipper,* 329 Md. at 492, 620 A.2d at 885;

*Potomac Elec. Power Co.,* 319 Md. at 526, 573 A.2d at 829; *Montgomery Ass'n,* 274 Md. at 63, 333 A.2d at 602, and 7) whether a two-tiered regulatory process existing if local laws were not pre-empted would engender chaos and confusion, *Skipper,* 329 Md. at 492–93, 620 A.2d at 885; *Potomac Elec. Power Co.,* 319 Md. at 527–28, 573 A.2d at 829–30; *Ad + Soil,* 307 Md. at 333, 513 A.2d at 906; *Montgomery Ass'n,* 274 Md. at 64, 333 A.2d at 602–03.

## A.

■ In light of the comprehensive state-licensing scheme for cigarette vending machines provided by Article 56, §§ 607 through 631, we conclude that the sale of cigarettes through cigarette vending machines is one of those "areas[s] in which the Legislature has acted with such force that an intent by the State to occupy the entire field must be implied. . . ." *Montgomery Ass'n,* 274 Md. at 59, 333 A.2d at 600.

■ In *Talbot County v. Skipper, supra,* we recently held that the state law governing sewage sludge utilization, which requires a person to obtain a state-issued permit before the person may utilize sewage sludge in this State, pre-empts by implication a county ordinance requiring a landowner to record certain information in the county land records before applying sewage sludge to his land in accordance with a state permit. 329 Md. at 482–83, 620 A.2d at 880–81. Although the statutory scheme at issue in *Skipper,* which included fifty pages of regulations, is comparatively more complex than the statutory scheme embodied by the cigarette licensing scheme in this case, the comprehensiveness with which the General Assembly has legislated in both fields is qualitatively equivalent. Whereas a larger and more complex statutory and regulatory scheme is warranted in the field of sewage sludge utilization given the many environmental and land use concerns, a smaller statutory scheme may pre-empt a less complex field of law. As we have recognized before, the inquiry is simply "whether the General Assembly has manifested a

purpose to occupy exclusively a particular field." *Ad + Soil,* 307 Md. at 324, 513 A.2d at 902.

Similar to the state laws governing the utilization of sewage sludge at issue in *Skipper,* the state laws governing the sale of cigarettes through vending machines requires a permit, §§ 611, 631, specifies the contents of the application, § 612, requires the issuance of the license by the Comptroller or clerk of the proper circuit court if the application requirements are satisfied, §§ 613, 631, authorizes the licensee to engage in the licensed business, §§ 614, 631, establishes provisions for the term and renewal of the licenses, §§ 615 and 631, establishes additional requirements in order to keep the license, including the proper labeling of the cigarette vending machine with an identification label and a warning label, § 617, COMAR 03.02.03.04D, provides for inspection of the cigarette vending machines, Md.Code (1990 Repl.Vol.), § 11–507 of the Commercial Law Article and Md.Code (1988), § 2–107 of the Tax–General Article, establishes grounds for denial of a license and specifies the circumstances under which a license can be suspended or revoked, §§ 618–622, and provides numerous criminal offenses punishable by jail or fines for failure to comply with the state laws. §§ 622, 630, 631. *See Skipper,* 329 Md. at 489–91, 620 A.2d at 884–85.

We conclude that "[t]hese statutory provisions manifest the general legislative purposes to create an all-encompassing state scheme," *Skipper,* 329 Md. at 491, 620 A.2d at 885, to regulate the sale of cigarettes through cigarette vending machines. Moreover, other factors support our conclusion that the state has pre-empted the field of regulation of the sale of cigarettes through vending machines.

For many years the General Assembly has exercised exclusive control over the sale of cigarettes. Since 1890, a county license to make retail sales of cigarettes has been required, Ch. 91 of the Acts of 1890, and since 1956, the cigarette vending machine operator's license and cigarette retailer's

license have been required, Ch. 90 of the Acts of 1956. Further, the General Assembly recently addressed the sale of cigarettes to minors through vending machines, the stated purpose for enactment of the municipal ordinances in this case. In Chapter 301 of the Acts of 1989, the General Assembly sought to curb the purchase of cigarettes by minors through vending machines by requiring that each vending machine display a conspicuous label stating the minimum age required for the lawful sale of cigarettes and the penalty for such a violation.

Obviously feeling the legislation did not go far enough to curb the sale of cigarettes to minors through vending machines, the cities of Takoma Park and Bowie subsequently enacted their ordinances in 1990 and 1991. What we stated in *Montgomery Ass'n* can be adapted to the instant case:

"In view of the General Assembly's long and exclusive control of [the sale of cigarettes] in this State, the Legislature's failure to foresee and take action expressly to prevent future local government trespass in this area of exclusive state legislative authority is no support for the validity of the ... ordinances."

274 Md. at 60 n. 5, 333 A.2d at 600 n. 5. *See also Potomac Elec. Power Co.*, 319 Md. at 529, 573 A.2d at 830–31; *Harker*, 316 Md. at 698, 561 A.2d at 227; *Ad + Soil*, 307 Md. at 333, 513 A.2d at 906; *National Asphalt Pavement Ass'n*, 292 Md. at 79–80, 437 A.2d at 653; *Sitnick*, 254 Md. at 322, 255 A.2d at 385.

These ordinances attempt to regulate an area in which no local control has traditionally been allowed, *Skipper*, 329 Md. at 493, 620 A.2d at 886; *Montgomery Ass'n*, 274 Md. at 65, 333 A.2d at 603, and unlike *Harker, supra*, and *Ad + Soil, supra*, there are no references in §§ 607 through 631 to concurrent legislative authority of local jurisdictions, *Ad + Soil*, 307 Md. at 626–28, 513 A.2d at 903–04, or requiring compliance with local ordinances, *Harker*, 316 Md. at 698, 561 A.2d at 226–27.

Although the particular aspect of the field sought to be regulated by the Cities of Takoma Park and Bowie is not addressed by §§ 607 through 631, i.e., the physical location of the cigarette vending machines on the premises,[14] *Skipper,* 329 Md. at 492, 620 A.2d at 885; *Potomac Elec. Power Co.,* 319 Md. at 526, 573 A.2d at 829, *Montgomery Ass'n,* 274 Md. at 63, 333 A.2d at 602, a two-tiered, or multi-tiered regulatory process depending on the number of jurisdictions that enact similar ordinances, would invite chaos and confusion, *Skipper, supra; Potomac Elec. Power Co.,* 319 Md. at 527–28, 573 A.2d at 829–30; *Ad + Soil,* 307 Md. at 333, 513 A.2d at 906; *Montgomery Ass'n,* 274 Md. at 64, 333 A.2d at 602–03, engendering, as it may be in this case, a requirement tantamount to a ban. The trial court determined that all of the cigarette vending machines in this case were generally accessible to minors. If we were to uphold these municipal ordinances and the vendors could not comply with these ordinances, the ordinances would be tantamount to a ban on cigarette vending machines in locations in which the State has granted the vendors a license to operate those vending machines.

Since the enactment of Ch. 301 in 1989, the General Assembly has experienced a spate of legislative activity concerning the sale of cigarettes from vending machines. House Bill No. 1384 of the 1990 General Assembly session, House Bill No. 663 of the 1991 session, and House Bill No. 172 of the 1992 session would have banned cigarette vending machines on a state-wide basis, but each of those bills died in the House Committee on Ways and Means. House Bill No. 1383 of the 1990 General Assembly session, House Bill Nos. 39 and 662 of the 1991 session, Senate Bill No. 625 of the 1991 session, Senate Bill No. 187 of the 1992 session, and House Bill Nos. 555 and 554 of the 1992 session would have prohibited cigarette vending

---

14. The sections governing the cigarette license applications, §§ 612(a) and 631, speak only to providing "where the place of business or vending machine is located." Under § 612, the application is to contain the information the Comptroller requires. In applications for licenses, the Comptroller requires only "Names and addresses where cigarette vending machines are located...." COMAR 03.02.03.03C.

machines in places where minors had access to them, but each of those bills also died in committee.[15] If the General Assembly intended to change existing law governing the sale of cigarettes through vending machines, it certainly has had the opportunities to do so. The failure to enact such measures "strongly suggests that there was no intent to allow local governments to enact different ... requirements." *Skipper*, 329 Md. at 493, 620 A.2d at 886.

## B.

In its analysis, the trial court relied on language in *Holmes v. Maryland Reclamation Assocs., Inc.*, 90 Md.App. 120, 600 A.2d 864, *cert. dismissed sub nom., County Council of Harford County v. Maryland Reclamation Assocs., Inc.*, 328 Md. 229, 614 A.2d 78 (1992), for the proposition that in determining whether state law pre-empts by implication similar local legislation that determination may hinge on how the "field" is defined. The issue presented in *Maryland Reclamation Assocs.* was whether state laws governing solid waste management pre-empted local control in the issuing of landfill permits. The intermediate appellate court expressed in dicta:

"Even if state law did not suggest the legislature's general purpose to reserve entirely this regulatory power to the expertise of state agencies, state legislation may *partially* preempt the field. In this context, much depends upon the meaning of the word 'field.' That is, a field could be defined inclusively to encompass everything under that heading (*i.e.* 'Solid Waste Management' includes all aspects of management, from cradle to grave), or it could be defined to mean precise subfields under the broader heading (*i.e.* 'Solid Waste Management' defined as a series of small fields, one

---

15. All of the bills died in the House Committee on Ways and Means, except for S.B. No. 187 of the 1992 session, which died in the Senate Judicial Proceedings Committee, and H.B. No. 1383 of the 1990 session, which died in the House Committee on Economic Matters.

of which might be local planning, another of which being state-issued permits)."

90 Md.App. at 154–55, 600 A.2d at 880–81. The trial court, persuaded by the reasoning of the intermediate appellate court, stated:

"This Court agrees with that reasoning. In order to communicate more easily as to whether this Court is referring to a general field or a segment of that field, this Court will use the word 'aspect' to mean a particular segment or portion of a general category, and 'field' to mean the general category. In this case, the field at issue is 'the sale of cigarettes' and the aspect at issue is 'the location of cigarette vending machines.' The issues are whether the state legislature has pre-empted the entire field of cigarette sales and, if not, whether it has left open the aspect of the location of cigarette vending machines for municipalities."

The trial court went on to determine "that the legislature did not intend to completely pre-empt the field of cigarette sales," and further concluded "that the legislature did not intend to occupy the aspect of the location of cigarette vending machines."

The trial court filed its opinion in the instant case on September 16, 1992. Previously, on June 15, 1992, we had granted a writ of certiorari in *Maryland Reclamation Assocs.,* 327 Md. 55, 607 A.2d 564. At oral argument in *Maryland Reclamation Assocs.,* the matter of the County Council's right to seek appellate review in this Court was raised and explored. 328 Md. at 230, 614 A.2d at 80. We determined that the County Council was not entitled to obtain appellate review in this case, and as there were no other parties seeking appellate review in this Court, we dismissed the writ of certiorari on October 23, 1993. *Id.* In dismissing the writ of certiorari, we emphasized:

"Although our dismissal of the writ of certiorari will have the effect of leaving intact the opinion and judgment of the Court of Special Appeals, our action should not be construed

as approval of the intermediate appellate court's opinion and judgment."

328 Md. at 236, 614 A.2d at 82.

Because we have previously determined that Article 56, §§ 607 through 631 pre-empts any local or municipal legislation in the field of the sale of cigarettes through cigarette vending machines, we need not and shall not address the trial court's discussion of "partial pre-emption" or "selective pre-emption."

## C.

In deciding that the Legislature did not intend to pre-empt the field of cigarette sales, the trial court placed much reliance on Article 56, § 611(c) which provides:

"(c) *Multiple licenses.*—A license under subsection (a) of this section is required:

(1) In addition to any other license required by law; and

(2) For each place at which a person engages in the business of a cigarette retailer."

The trial court determined that the Legislature by providing the phrase "[i]n addition to any other license required by law," granted to other entities, including municipalities, the power to also regulate the sale of cigarettes through licensing requirements. For several reasons we now explain, we disagree with the trial court's interpretation of § 611(c).

In interpreting § 611(c), we seek to ascertain and effectuate legislative intent, the primary source of which is the language of the statute itself. *Boulden v. Mayor of Elkton,* 311 Md. 411, 414, 535 A.2d 477, 479 (1988); *Kaczorowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987). As we stated in *Kaczorowski,*

" '[W]here a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. *State v. Fabritz,* 276 Md. 416,

348 A.2d 275 (1975); *Height v. State,* 225 Md. 251, 170 A.2d 212 (1961). In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.'"

309 Md. at 513, 525 A.2d at 632 (*quoting Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730, 732 (1986)).

The language "[i]n addition to any other license required by law" was part of the original enactment of Ch. 90, § 2 of the Acts of 1956. As stated previously, Ch. 90 of the Acts of 1956 established the requirement for the cigarette vending machine operator's license and the cigarette retailer's license. Prior to that enactment, additional licenses were also required elsewhere in the Code. Since the enactment of Ch. 91 of the Acts of 1890, a county license had been required to make retail sales of cigarettes. Md.Code (1951, 1956 Supp.), Art. 56, § 61 (now codified in Art. 56, § 631). In addition, a state sales tax license was required to make retail sales. Md.Code (1951, 1956 Supp.), Art. 81, § 356.[16]

■ The only logical and reasonable reading of § 611(c) leads to the conclusion that it is not an express grant of authority to local jurisdictions to regulate the sale of cigarettes through licensing. Rather, the phrase "[i]n addition to any other license required by law" is merely an affirmation that cigarette retailers and cigarette vending machine operators are not exempt from the other licenses required by the Code in order to sell cigarettes.

■ This conclusion is supported by the revisor's note following Md.Code (1992), § 16–202 of the Business Regulation Article, which is the new section of the Code where former Article 56, § 611 was transferred and recodified without substantive change. *See supra* note 5. Section 16–202

16. A state sales tax license is still required today. Md.Code (1988, 1992 Cum.Supp.), §§ 11–701 through 11–712 of the Tax–General Article.

has eliminated the phrase "[i]n addition to any other license required by law." The revisor's note states in relevant part:

"In subsection (c) of this section, the former requirement that the license is required '[i]n addition to any other license required by law' is deleted as implicit."

As we recently stated, " 'notes of reports of a revisor or revision commission are entitled to considerable weight in ascertaining legislative intent.' " *Waddell v. Kirkpatrick,* 331 Md. 52, 63, 626 A.2d 353, 358 (1993) (*quoting Office & Professional Employees Int. v. MTA,* 295 Md. 88, 101, 453 A.2d 1191, 1197 (1982)). *See also Belcher v. T. Rowe Price Foundation, Inc.,* 329 Md. 709, 745, 621 A.2d 872, 890 (1993); *Dean v. Pinder,* 312 Md. 154, 163, 538 A.2d 1184, 1189 (1988). Although the Business Regulation Article created by Ch. 4 of the Acts of 1992 became effective on October 1, 1992, *see supra* note 5, which was after the trial court filed its opinion in this case, the revisor's note to § 16–202 of that article further supports our conclusion that Art. 56, § 611(c)(1) was merely an affirmation that cigarette retailers and cigarette vending machine operators were not exempt from obtaining the other licenses required by the Code in order to sell cigarettes.

Having determined that § 611(c) authorized local jurisdictions to license the sale of cigarettes, the trial court relied on *Harker, supra,* and *Ad + Soil, supra,* two decisions where local laws were not pre-empted by state laws, and determined that the cities' ordinances in this case similarly were not pre-empted. In *Potomac Elec. Power Co.,* we distinguished *Harker* and *Ad + Soil* for reasons that are applicable here as well. 319 Md. at 524–25, 573 A.2d at 828–29. There we stated:

"In *Harker,* we were asked to determine whether a state-licensed and regulated child-care facility was subject to county zoning law as it related to the location of such facilities. In holding that local zoning ordinances were not impliedly preempted, we noted that there was no comprehensive regulatory scheme governing child-care facilities under state law. We recognized that § 5–506(b) of the Family Law Article vested legislative authority in the Social Services Administration of the Maryland Department of

Human Resources, which in turn promulgated COMAR 07.02.13.07 'explicitly requir[ing] a licensed child-care facility to comply with the zoning ordinances of political subdivisions.' 316 Md. at 698, 561 A.2d 219. We said that 'the agency rule is entitled to considerable weight in determining the meaning of [the statewide statutory] provisions relating to child-care facilities.' *Id.* at 699, 561 A.2d 219. . . .

"In *Ad + Soil,* the question presented was whether a county could require a special exception permit for the operation of a sewage sludge storage and distribution facility when the facility had already obtained state permits for its operations. We found that the county zoning ordinance had not been impliedly preempted by the provisions of state law governing the operation of sewage sludge facilities. Of particular importance was the fact that 'Title 9 of the Health Environmental Article, which contains the bulk of the state law governing sewage management, is replete with references to the concurrent legislative authority of local jurisdictions.' *Id.* [307 Md.] at 326–27, 513 A.2d 893. The law also required '[e]ach county . . . to adopt a comprehensive plan for sewage management, to be submitted for the review and approval of the Department of Health and Mental Hygiene;' and '[t]he Department may not issue a permit for a sewage sludge composting facility unless the facility complies with all applicable county zoning and land use requirements and is not opposed by the local legislative body.' *Id.* at 327, 513 A.2d 893. 'In promulgating regulations regarding water pollution, the Department is required to consider local zoning laws.' *Id.* In fact, it was unequivocally clear that the General Assembly contemplated deference to local authority as shown by the extensive references to governing bodies of counties and other explicit language used which demonstrated a specific intent to coordinate and supplement local legislation."

Unlike the state laws in *Harker, supra,* at no place in Article 56, §§ 607 through 631 is there a provision requiring compliance with local ordinances as a precondition for the sale of cigarettes through vending machines. Moreover, unlike the

state laws in *Ad + Soil*, there are no references in Article 56, §§ 607 through 631 to the concurrent legislative authority of local jurisdictions to legislate in this area.

In short, through the enactment of Article 56, §§ 607 through 631, the General Assembly has manifested an intent for the State to completely occupy the field of the sale of cigarettes through vending machines rendering any local or municipal ordinances in this area constitutionally invalid.

***JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR THE ENTRY OF JUDGMENT DECLARING §§ 10B–15, 10B–16, 10B–17 and 10B–34(f) of CITY OF TAKOMA PARK ORDINANCE NO. 1990–39 AND CITY OF BOWIE ORDINANCE 0–1–91 INVALID; COSTS TO BE PAID BY THE CITIES OF TAKOMA PARK AND BOWIE.***

RODOWSKY, J., dissents and files an opinion in which MURPHY, C.J., joins.

RODOWSKY, Judge, dissenting.

I respectfully dissent from the holding that "the comprehensive state-licensing scheme for cigarette vending machines provided by Article 56, §§ 607 through 631" occupies the entire field of the sale of cigarettes through cigarette vending machines. 332 Md. at 300, 631 A.2d at 87. The majority, in my view, has treated as relevant that which is irrelevant. The statutes relied upon by the majority are a conglomeration of portions of four separate enactments, the common denominator of which is that they relate in some way to the sale of tobacco, and thus include the sale of cigarettes through vending machines. Some of these statutes are not regulatory at all; others are regulatory in whole or in part, but were never intended to regulate for the public health as do the municipal ordinances at issue here. A review of the purposes of these separate enactments fails to demonstrate an intent to exercise exclusive control over all aspects of cigarette vending machine sales. Nor, in my opinion, is preemption by conflict applicable to the subject municipal ordinances.

The majority has selected as the controlling state statutes the form of those statutes on a date immediately preceding the enactment of the subject municipal ordinances. Thus, the majority opinion is written exclusively in terms of Maryland Code (1957, 1988 Repl.Vol., 1991 Cum.Supp.), Art. 56, §§ 607 through 631.[1] Unfortunately, utilizing that date has produced an extraneous, complicating factor in the analysis. All of some, and some of all, of the four enactments referred to above had been restyled, as of that date, in the code revision process. Specifically, when the Tax–General Article (TG) of the Code was enacted by the Acts of 1988, Chapter 2, §§ 607 through 631, in restyled form, were temporarily codified in Art. 56. This was in anticipation of the adoption of the Business Regulation Article (BR), which was later enacted by Chapter 4 of the Acts of 1992. Code revision has larded these four enactments with an overlay of verbiage that, while not intended to alter substance, has obfuscated the preemption analysis.

Accordingly, in Part I of this dissent I shall review the history of the four enactments underlying §§ 607 through 631. There I conclude that, in that form, they did not effect preemption. Part II of this dissent will describe the undifferentiated treatment of these enactments in the code revision process and consider whether that treatment has distorted the enactments from their original purposes and produced preemption by occupation of the field. I conclude that total preemption is not produced. Part III then addresses one of these enactments, a criminal statute, from the standpoint of preemption by conflict. There I conclude that the criminal statute has not produced preemption by conflict.

## I

The earliest of the four enactments, one dating back to 1886, is the criminal statute establishing a minimum age for the

---

1. In this dissenting opinion statutory references also will be to Md.Code (1957, 1988 Repl.Vol., 1991 Cum.Supp.), Art. 56, unless otherwise expressly noted or apparent from the context.

purchase of tobacco products. Chronologically next is an 1890 revenue measure requiring that all vendors of cigarettes obtain from the clerk of a circuit court, in addition to a traders' license, a cigarette license.[2] A Cigarette Sales Below Cost Act was enacted in 1956, requiring, as part of the administration of that program, that cigarette vendors obtain an additional license. Then, in 1958, a stamp tax on cigarettes was enacted.

## A

Chapter 371 of the Acts of 1886 is entitled, "AN ACT to protect the health and morals of minors in the State of Maryland." Any person engaged in the manufacturing, buying, or selling of cigars, cigarettes, or tobacco who sold, bartered, or gave any cigar, cigarette, smoking or chewing tobacco to any person under the age of fourteen years committed a criminal offense, unless the minor's parent authorized the transaction or the minor was acting solely for the minor's employer. The penalty was a minimum $10, maximum $100 fine, or imprisonment for five to thirty days in default of payment of the fine. The minimum age was raised to sixteen years by Chapter 131 of the Acts of 1985 and to eighteen years by Chapter 301 of the Acts of 1989. The 1989 enactment will be more fully discussed in Part III.

## B

Persons who sold goods, wares or merchandise, including cigars, cigarettes, or tobacco, from a fixed location historically have been required to obtain a traders' license from a circuit court clerk. Code (1888), Art. 56, §§ 35 through 37. The value of the trader's inventory has determined the amount of the license fee. *Id.* §§ 38 through 49. Similarly, itinerants selling goods, not limited to tobacco products, have been required to obtain a peddlers' license. *Id.* §§ 27 through 34. The peddlers' license fee historically has been determined by

---

2. To simplify matters this dissenting opinion assumes that at all relevant times there was a Circuit Court for Baltimore City.

the mode of travel, *i.e.*, whether on foot or by vehicle. *Id.* § 28.

Chapter 91 of the Acts of 1890 added new sections to Code (1888), Art. 56, Title, "Licenses," subtitle, "Traders." These sections required an additional license, issued by the clerk of a circuit court for a fee of $50, in order to sell cigarettes, or tobacco wrapped with any material other than tobacco. The applicant was required to state on oath "that the cigarettes intended to be sold under said license contain no injurious drug or narcotic." *Id.* § 54B. That oath was deleted from the statute, and the license fee reduced to $10, by Chapter 439 of the Acts of 1896.

The traders' license, the peddlers' license, and, in my opinion, the comparable cigarette license also obtained from a circuit court clerk are revenue measures. In *Banks v. McCosker*, 82 Md. 518, 34 A. 539 (1896), an unlicensed peddler had taken the defendant's promissory note in consideration of goods sold. That note was transferred to the plaintiff. When the plaintiff sued to collect, the buyer raised as a defense illegality of the transaction underlying the note. In rejecting that argument, this Court said of the peddlers' license:

"The provisions of the Code referred to neither directly nor indirectly refer to any consequences, save the payment of a fine for a violation of the law, and the failure to pay such fine, so that it can only be regarded as a revenue measure, and does not affect the contract between an unlicensed pedlar, and the purchaser of goods from him.... If the statute seeks only the collection of revenue as ours clearly does, there can be no doubt as to its purpose and meaning, but when ... it is the design of the law-making power to protect the public from fraud in the contract for the promotion of some object of public policy, the contract is then prohibited."

*Id.* at 522–23, 34 A. at 540.

This Court reviewed the criminal conviction of an unlicensed ice cream peddler in *Brown v. State*, 177 Md. 321, 9 A.2d 209 (1939). In response to the contention that the peddler's

statute survived only as a police regulation, this Court said that the licensing "requirement seems indistinguishable from any other trade or occupational tax; and this is so even if it may be assumed that it is intended to equalize the public burdens as between hawkers and peddlers and traders in fixed situations." *Id.* at 328, 9 A.2d at 212.

This 1890 enactment was codified as §§ 63 and 64, under the subtitle, "Traders [Licenses]," in Code (1957, 1988 Repl. Vol.), and then in restyled form as § 631 under the 1988 reorganization. Currently the fee is set at $25. § 631(c)(1). This $25 tax was simply one of the many licenses issued by circuit court clerks. The distribution of the fees from this melange, including fees from the cigarette license, was governed by § 3. The fees were

"[r]eceipts from licenses issued for billiard tables, bowling alleys, chain stores, cigarettes, circuses, cleaning, dyeing and pressing, construction firms, garages, hawkers and peddlers, laundries, motion picture machines, moving picture shows, plumbers and gas fitters, restaurants or eating places, shows, soda water fountains, theatres, traders, and wholesale dealers in farm machinery."

*Id.* The issuing clerk retained "as a fee of his office the present percentage of license revenues as authorized by law and the additional issuance fee now allowed." *Id.* After paying to the general fund of the State three percent "to defray the expenses of the State License Bureau," the net proceeds were to be paid by the clerk "to the incorporated town or city in which the licensed business or activity is located." *Id.* If the licensed business were located in an unincorporated area, "the net proceeds shall be paid to the county in which the licensed business or activity is located." *Id.*

I shall refer to this fee as the "Cigarette Traders' License." It is referred to in the majority opinion as the "County License."

## C

What the majority refers to as the "Cigarette Vending Machine Operators License" has its origins in Chapter 90 of the Acts of 1956. The explanation by the Legislative Council accompanying the draft of the bill which became Chapter 90 encapsulates the purpose of that legislation.

> *"This bill was proposed by the Wholesale Tobacco Distributors of Maryland. It would add to the so-called 'Unfair Sales Act', which has been on the statute books for a number of years, an additional set of laws applying the principle of the Unfair Sales Act more specifically to the sale of cigarettes. The complaint is that the present Unfair Sales Act does not entirely reach the practices of 'bait' or 'loss-leaders' with respect to the sale of cigarettes. The law would be administered by the State Comptroller, and the sponsors cite that its licensing revenues would defray the cost of administration."* [3]

Legislative Council, *Report to the 1956 Maryland General Assembly* at 189.

---

**3.** A more ornamented statement of public policy underlying the Sales Below Cost Act is found in the preamble of Chapter 90 of the Acts of 1956. It reads:

"WHEREAS, cigarettes, because of their standardized character, their great popularity, their widespread and varied types of markets and methods of distribution and the sensitivity of their distribution to price fluctuations, are particularly susceptible to use as 'bait' or 'loss leaders' to deceive the public; and

"WHEREAS, the advertising, offering to sell, or sale of cigarettes below cost with the intent of injuring a competitor or competitors, or of substantially lessening or destroying competition, is an unfair, deceptive, destructive and unethical business practice, which has been and is demoralizing and disorganizing the distribution of cigarettes, and fostering monopoly and high prices by tending to force independent wholesalers and retailers out of business; and

"WHEREAS, the distinctive character of cigarettes and the economic facts and circumstances peculiar to their distribution require special and individualized treatment of the problems created by advertising, offering and selling cigarettes below cost; and

"WHEREAS, the public welfare will be promoted by the prohibition of such practices in the distribution of cigarettes and the effective enforcement of such prohibition. . . ."

Chapter 90's substantive provisions were originally codified at Code (1957), Art. 83, Title, "Sales and Notices," under a new subtitle, "Unfair Cigarette Sales Act." Today they are Code (1975, 1990 Repl.Vol.), §§ 11–501 through 11–510 of the Commercial Law Article (CL), Title, "Trade Regulation," subtitle, "Cigarette Sales Below Cost Act."

The provisions of Chapter 90 relating to enforcement of the Sales Below Cost Act were codified in Art. 56. Prior to the 1988 restyling, those provisions were Code (1957, 1988 Repl. Vol.), Art. 56, §§ 65 through 73.

A retailer of cigarettes, other than "a vending machine operator," must obtain a license for each place of business at an annual fee of $3. § 65. This license is issued by the clerk of the circuit court for the county where the business is located. *Id.* Wholesalers of cigarettes and "cigarette vending machine operators" obtain their licenses from the Comptroller at an annual fee of $250. § 66. "Vending machine operator" is defined by reference to the substantive provisions of the Sales Below Cost Act. It means a person who owns and operates cigarette vending machines on forty or more premises. CL § 11–501(k)(2). Whether a seller is a "vending machine operator" has significance for certain computations of mark up and cost under the Sales Below Cost Act. *See, e.g.,* CL § 11–503.

These license fees are "paid over to the General Fund of the State, and it is intended that the said fees are to be used to cover the expenses of administration of the licensing program and the enforcement of the Cigarette Sales Below Cost Act." § 68. Thus, these licenses are issued to raise the revenue needed to enforce the Sales Below Cost Act, in keeping with the promise of the Wholesale Tobacco Distributors of Maryland to the General Assembly. In this dissent I shall call this revenue license the "Sales Below Cost Act License."

The revenue raising feature of the Sales Below Cost Act is simply incidental to its regulatory purpose, which has nothing to do with the public health. This Court addressed the subject enactment in *George W. Cochran Co. v. Comptroller,*

292 Md. 3, 437 A.2d 194 (1981). Cochran Co.'s Sales Below Cost Act License had been suspended for having made thirty-five sales below cost. Cochran Co. had reduced its prices in order to meet those of a competitor, but that was not defensive because the Comptroller found that the appellant knew that the competitor's prices were also illegal. *Id.* at 12 n. 4, 437 A.2d at 198 n. 4. The appellant's contention in this Court was that the Sales Below Cost Act was a price fixing scheme in conflict with § 1 of the Sherman Act.

In rejecting that contention we assumed, *arguendo,* that the statute would be invalid under the Sherman Act but for the state action exception recognized in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). 292 Md. at 7, 437 A.2d at 196. We held that the *Parker v. Brown* exception did apply because the Maryland Sales Below Cost Act

"is not simply an authorization for private parties to engage in price-fixing arrangements and is not merely an enforcement mechanism for the prices agreed upon by private parties. The Maryland statute directly imposes its requirements upon cigarette wholesalers and retailers without regard to any agreements or arrangements which might or might not exist among those private businesses.... The challenged 'restraints of trade' are 'compelled by the direction of the State acting as a sovereign.'"

292 Md. at 11, 437 A.2d at 198.

### D

The fourth enactment that crosses the trail of §§ 607 through 631 is the stamp tax on cigarettes. The background of this tax is succinctly stated in R. Walsh & W. Fox, *Maryland, A History* (1983). Describing the 1957 General Assembly session, the authors state:

"Pressed by a strong lobby, the legislature approved an increase of $400 per teacher in state aid for salaries, the costs to be covered by a three-cent cigarette tax. The governor vetoed the bill after adjournment of the session with the observation that teachers' salaries should be in-

creased by local governments 'primarily responsible' for schools. The legislature in 1958 promptly overrode the veto."

*Id.* at 822 (footnote omitted).

The enactment is Chapter 1 of the Acts of 1958. It established minimum salaries for public school teachers, and created a new subtitle in Art. 81, "Revenue and Taxes," entitled, "State Tobacco Tax Act." As part of the code revision process, many of the administrative provisions of this act were later moved to Article 56. *See* §§ 617, 618 and 622 through 630.

Chapter 1 required that each package of cigarettes bear a stamp demonstrating that the tax had been paid. Ch. 1, § 421. The obligation to purchase the stamps from the Comptroller and affix them on a particular supply of cigarette packages was that of the first distributor in Maryland who possessed the cigarettes. *See Id.* § 420. Unstamped cigarettes are contraband. *Id.* § 425. Persons obliged to purchase and affix the stamps must obtain a license from the Comptroller at a one-time fee of $1. *Id.* § 429. That "license was intended only to allow a person to buy unstamped cigarettes from a manufacturer and to buy and affix tax stamps to cigarettes." Revisor's Note to § 610.

When Chapter 1 was enacted five counties and Baltimore City also taxed cigarettes at rates ranging from one to three cents per pack. Maryland Legislative Council Committee on Taxation and Fiscal Matters, *Technical Supplement to 1960 Report on State–Local Fiscal Relations* at 105 (1961). Under Chapter 1, the Comptroller collected those local taxes and remitted them to the taxing subdivisions. Ch. 1, § 443(C). Chapter 321 of the Acts of 1961 increased the stamp tax to six cents per pack of twenty cigarettes and repealed the local taxes by providing that, "[a]fter July 1, 1961, no political subdivision of this State shall have any power or authority to impose a tax upon cigarettes, whether under a public general or public local law." Ch. 321, § 460(b). The enactment provided essentially for a 50–50 split of the stamp tax between

the State and all of the counties, including Baltimore City. *Id.* § 460(a)(4). As of the time selected by the majority for its analysis, approximately thirty percent of the net receipts after cost of collection of the cigarette tax was distributed to the counties, including Baltimore City, and seventy percent to the State. TG §§ 2–1601 through 2–1605.

Chapter 669 of the Acts of 1961 amended this cigarette tax to require that the owner of a cigarette vending machine be identified on a label affixed to the machine. Ch. 669, § 444½. That section was further amended by Chapter 344 of the Acts of 1963 to require that packages of cigarettes be loaded into vending machines with the tax stamp visible. Ch. 344, § 444½. The statute further authorized inspectors from the Comptroller's Office to seal a vending machine upon observing apparent contraband. *Id.* Tampering with that seal was made a criminal offense. *Id.*

In this dissent the state tax on tobacco is called the "Stamp Tax."

**E**

From the foregoing review, I conclude that, prior to the enactment of the subject municipal ordinances, the required licenses did not form a comprehensive, health based, state regulation of cigarette vending machines. Vending machines are simply one method of selling cigarettes, and selling cigarettes is simply one aspect of selling tobacco products. The Cigarette Traders' License and the Sales Below Cost Act License are revenue licenses. The license for the first distributor under the Stamp Tax is a tool in administering that statute, which is a revenue measure.

With the exception of the minimum age requirement under the criminal statute, none of the four enactments reviewed above is a regulation for the public health. To the extent that there is regulation of conduct in conjunction with the revenue measures, the purpose of the regulation is to assist and enforce the raising of the revenue involved. None of the

enactments suggests its purpose or policy is to prevent local health regulation.

The Stamp Tax does prohibit local legislation, but that prohibition is limited to a local tax on cigarettes. That prohibition against local taxation also illustrates that the General Assembly knows how to preempt, expressly, local legislation on a particular subject when the General Assembly intends that result.

## II

When the Tax–General Article was adopted in 1988, the substantive provisions of the Stamp Tax were included as Title 12 of that Article.[4] Certain administrative provisions of the Stamp Tax were moved to Art. 56. Those provisions, the Cigarette Traders' License, the administrative provisions of the Sales Below Cost Act, and portions of the criminal statute were restyled to code revision format and lodged in §§ 607 through 631 under the subtitle, "Cigarette Licenses," in anticipation of the adoption of the Business Regulation Article. That subtitle contained three parts, "Definitions," "Cigarette Business Licenses," and "License to Make Retail Sales of Cigarettes in Counties." The latter is the Cigarette Traders' License. "Cigarette Business Licenses" combined the license for what was formerly a "distributor" under the Stamp Tax, the Sales Below Cost Act Licenses, and some features of the criminal statute.

The General Revisor's Note to the Business Regulation Article which follows BR § 18–202 advises that this combining of provisions was intended to be consistent with the Department of Legislative Reference's charge to revise the law "in a clear, concise, and organized manner, without changing the effect of the law." That same note also advises that the statutory provisions antecedent to code revision were embellished in the process.

---

4. The distribution provisions were included in Title 2, subtitle, "Tobacco Tax Revenue Distribution," §§ 2–1601 through 2–1605 of the Tax–General Article.

"One precept of revision has been that, once something is said, it should be said in the same way every time. To that end, the language and organization of this article is conformed to the 21 previously enacted articles. Thus, for example, the provisions of this article for regulatory bodies, for licensing, and for prohibited acts have been drafted in accordance with Model Guide for Drafting Governmental Units and Licensing Provisions, developed in conjunction with the revision of the Health Occupations and Business Occupations and Professions Articles."

*Id.* *See also* General Assembly of Maryland, Dep't of Legislative Reference, Statutory Revision Division, *Model Guide for Drafting Governmental Units and Licensing Provisions* (rev. 1989), in its entirety and particularly at 1–8.

The decision to style these revenue licenses as if they were regulatory licenses in various fields of health occupations produces a formal structure that can be illustrated by § 631, which deals with the Cigarette Traders' License. This section addresses definitions, the license requirement, application, issuance, scope, term, display, revocation, administrative hearing on revocation, a prohibition against nonlicensed activity, and a penalty. The qualifications necessary to obtain this license are asking for it and paying a $25 fee. § 631(c).

In its restyled form of tracking professional and occupational regulatory licensing statutes, the Cigarette Traders' License section has a "Scope" subsection reading, "While it is effective, a license issued under this section authorizes the licensee to make retail sales of cigarettes in the county for which the license is issued." § 631(e). Surely this is not a roving commission to sell cigarettes at any site in the county for which the license is issued. The license does not override local zoning restrictions. *See Board of Child Care of the Baltimore Annual Conference of the Methodist Church, Inc. v. Harker,* 316 Md. 683, 561 A.2d 219 (1989) (holding that state-issued licenses for day care centers did not preempt local restrictions on their locations); *Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 513 A.2d 893 (1986) (holding that state-issued permits and guidelines for sludge disposal did not

preempt local zoning restrictions). The authorization referred to in § 631(e) necessarily means that the licensee is authorized to the extent of having paid the required revenue fee.

The Cigarette Traders' License may be denied, revoked, or suspended

"if the applicant or licensee:

(1) Fraudulently or deceptively obtains or attempts to obtain a license for the applicant, licensee, or for another person;

(2) Fraudulently or deceptively uses a license; or

(3) Fails to comply with the provisions and regulations of the Cigarette Sales Below Cost Act."

§ 631(h).

These provisions do not convert the Cigarette Traders' License into a regulatory measure of any significance here. Paragraph (3) simply states the result of not complying with the Cigarette Sales Below Cost Act's substantive provisions. Further, inasmuch as a Cigarette Traders' License will not be issued if tangible personal property taxes are owed, § 2A(a), § 631(h) paragraphs (1) and (2) seem designed to prevent property tax evasion.[5]

The majority draws its greatest comfort for the preemption holding from Part II of the "Cigarette Licenses" subtitle, §§ 610 through 630. Part II does not require any qualifications of any applicant for any license. There is no testing or examination. Section 612 specifies only that applicants must apply and pay the appropriate, required fee. The fees set forth in § 612 for the various types of cigarette sellers are basically the same amounts previously paid to obtain Sales Below Cost Act Licenses. As shown, *supra*, those fees are the annually required contributions from tobacco vendors at all

---

**5.** Paragraphs (1) and (2) also prohibit giving the clerk a false name in order to obtain a second Cigarette Traders' License for the same location and licensing period, even if the license fee has already been paid, and thereby prohibit paying the tax twice. But one would think that such situations would be relatively rare.

levels of distribution for the Sales Below Cost Act's price enforcement program. For those engaging in the business of a cigarette retailer, the cost is $3. § 612(a). That is the former Sales Below Cost Act License fee, per location, for retailers and for vending machine operators who have machines at less than forty locations. The license to engage in the business of a "cigarette subwholesaler" or a "cigarette vending machine operator" is $250.[6] § 612(b) and (c). The initial license to engage in the business of a cigarette wholesaler is $251. § 612(d). This is simply the annual $250 Sales Below Cost Act License fee and the $1, nonrecurring fee to become authorized to purchase tax stamps. Renewed wholesaler's licenses are $250 annually. See Revisor's Note following § 610.

Subsection 617(b), paragraphs (1) and (2) simply continue provisions relating to vending machines that are derived from the Stamp Tax, namely, requiring visible display of the stamp on packages of cigarettes in the machine and identification of the machine operator by a label on the machine.

The Revisor's guidelines, of course, called for a scope provision for each of the "cigarette business licenses." While those licensing provisions were temporarily lodged in Art. 56, §§ 610 through 630, the scope section, § 614, alerted the reader to the following:

"While it is effective, a license issued under this Part I[I] of this subtitle authorizes the licensee to:

(1) Engage in the business of a cigarette retailer;

(2) Engage in the business of a cigarette subwholesaler;

(3) Engage in the business of a cigarette vending machine operator;

(4) Engage in the business of a cigarette wholesaler; or

---

**6.** The terminology, "subwholesaler," was new. Revisor's Note following Art. 56, § 610(m). The term has been limited to a person who "buy[s] stamped cigarettes from a wholesaler or another subwholesaler." BR § 16–206(c)(2).

(5) Engage in the business of a licensed manufacturer's warehouse operator."

These provisions have since been amplified in BR § 16–206 by combining the requirement for one of the Sales Below Cost Act Licenses with a specification of who may possess unstamped cigarettes and who may deal only in stamped cigarettes under the Stamp Tax.[7]

Denial, revocation, and suspension of these cigarette licenses were covered by § 618 which reads in full:

"(a) *In general.*—Subject to the hearing provisions of § 619 of this subtitle, the Comptroller may deny a license to any applicant, reprimand any licensee, or suspend or revoke a license if the applicant or licensee:

(1) Fraudulently or deceptively obtains or attempts to obtain a license for the applicant, licensee, or for another person;

---

7. BR § 16–206 reads in full as follows:

"(a) *Manufacturer's warehouse operator license.*—A manufacturer's warehouse operator license authorizes the licensee to act as a manufacturer's warehouse operator.

(b) *Retailer license.*—A retailer license authorizes the licensee to:
    (1) act as a retailer; and
    (2) buy stamped cigarettes from a subwholesaler or wholesaler.

(c) *Subwholesaler license.*—A subwholesaler license authorizes the licensee to:
    (1) act as a subwholesaler; and
    (2) buy stamped cigarettes from a wholesaler or another subwholesaler.

(d) *Vending machine operator license.*—A vending machine operator license authorizes the licensee to:
    (1) act as a vending machine operator; and
    (2) buy stamped cigarettes from a subwholesaler or wholesaler.

(e) *Wholesaler license.*—A wholesaler license authorizes the licensee to:
    (1) act as a wholesaler;
    (2) buy unstamped cigarettes directly from a cigarette manufacturer;
    (3) hold unstamped cigarettes;
    (4) buy tobacco tax stamps as authorized by § 12–303 of the Tax–General Article;
    (5) transport unstamped cigarettes in the State; and
    (6) sell unstamped cigarettes to another licensed wholesaler if the Comptroller specifically authorizes."

(2) Fraudulently or deceptively uses a license;

(3) Fails to comply with the provisions and regulations of the Cigarette Sales Below Cost Act; or

(4) Buys cigarettes for resale:

(i) In violation of a license; or

(ii) From a person who is not a cigarette manufacturer, a licensed subwholesaler, a licensed vending machine operator, or a licensed wholesaler.

(b) *Additional cause for wholesaler license revocation.*— Subject to the hearing provisions of § 619 of this subtitle, the Comptroller may revoke a license to engage in the business of a cigarette wholesaler if the licensee violates any provision of Title 12 of the Tax–General Article.

(c) *Additional cause for license denial.*—Subject to the hearing provisions of § 619 of this subtitle, the Comptroller shall deny a license to any applicant who has a license revoked under this section:

(1) For 1 year following the date the license is revoked; and

(2) Until it satisfactorily appears to the Comptroller that the applicant will comply with the requirements and regulations of this title."

Paragraphs (a)(1) and (2) reflect the same Revisor's drafting policy noted above with respect to the Cigarette Traders' License. In this context, they only relate to collecting the revenue. Paragraph (a)(3) enforces the Sales Below Cost Act. Paragraphs (a)(4) and (b) enforce the Stamp Tax. The minimum one year duration of a revocation found in subsection (c) is a feature of the Sales Below Cost Act, formerly Art. 56, § 70(a).

The Stamp Tax Act's prohibition against a local tax on cigarettes is now codified as TG § 12–102(b). This limited, express preemption provision would not be required if the administrative provisions codified under "Cigarette Business Licenses" prevented all local legislation relating to the sale of tobacco products.

My conclusion is that code revision did not convert these licensing statutes into regulations for the public health. Further, none of the restyled licensing enactments suggests a purpose or policy of preventing local health regulation. There is, in my opinion, no total preemption by state occupation of the field of vending machine sales of cigarettes.

## III

The remaining question, as I see it, concerns the minimum age criminal statute, Code (1957, 1992 Repl.Vol., 1992 Cum. Supp.), Art. 27, §§ 404 and 405. The offense is selling cigarettes to a minor, but, under the statute, the minor does not commit an act expressly proscribed by §§ 404 and 405 by buying cigarettes. As previously noted, these sections were most recently amended by Chapter 301 of the Acts of 1989. The minimum age was raised from sixteen to eighteen years. The minimum fine and the obsolete reference to imprisonment were eliminated from § 405(a) so that the infraction carries only a fine of up to $100 for each offense. A new subsection 405(b) was added to read:

"If the requirements of Article 56, § 617(b)(3) of the Code are satisfied, the provisions of subsection (a) of this section do not apply to the owner of a tobacco product vending machine or any other person exercising control over a tobacco product vending machine if a person under 18 has purchased a tobacco product from a vending machine."

Chapter 301 also added a new paragraph (3) to Art. 56, § 617(b) to provide:

"A licensee who sells cigarettes through a vending machine shall:

. . . .

"(3) display, in the manner that the Comptroller requires by regulation, a conspicuous label that states the age requirement and penalty as provided under Article 27, §§ 404 and 405 of the Code."

Chapter 301 was Senate Bill 65 of the 1989 session. The legislative file on Senate Bill 65 reflects overwhelmingly that

its purpose was to protect the health of minors. The sponsor of the bill, testifying before the House Judiciary Committee, blamed cigarette smoking for 315,000 deaths nationally each year, $16.1 billion in direct medical costs, and $26.1 billion in indirect costs, including lost time from work. The sponsor also pointed to a study of United States high school students in 1985 that "clearly establishes the link between smoking and illicit drug use among the pack-a-day smokers."

Describing what became paragraph (3) the sponsor simply noted:

> "The measure's enforcement and penalty provisions do not apply to tobacco product vending machine owners or people exercising control over such machines. However, the bill requires anyone licensed to sell cigarettes through a vending machine to display a conspicuous label stating the age requirement for cigarette purchase and the legal penalty for violation of the law."

Thus, when the class of ineligible purchasers was enlarged, a defense to possible criminal prosecution was given to vendors of cigarettes who would not personally be making over the counter sales.

I see no conflict amounting to preemption between § 617(b)(3) and the municipal ordinances at issue here. The latter complement or supplement the former. In analogous situations this Court has found that state regulations did not preempt local legislation. For example, Baltimore City could require a higher minimum wage for waitresses in taverns than that required by state statute. *See City of Baltimore v. Sitnick & Firey*, 254 Md. 303, 255 A.2d 376 (1969). Similarly, the expiration of a statewide rent control enabling statute did not conflict with the pre-existing power of Baltimore City under its charter to legislate a rent control program. *See Heubeck v. Mayor & City Council of Baltimore*, 205 Md. 203, 107 A.2d 99 (1954). Here, the municipal ordinances prohibit locating cigarette vending machines in places frequented by minors. They further require that cigarette vending machines in establishments not frequented by minors be located where

some person employed by the establishment ordinarily would have the machine in view while performing duties in regular course for the establishment.

In order to give preemptive effect to § 617(b)(3), one must infer that the intent of the General Assembly was to prevent any local government from requiring, in addition to the state-wide warning, any conduct aimed at ensuring that cigarettes not be sold to persons under age eighteen. That reading means that the General Assembly was not only indifferent to, but intended to prevent prohibition of, locating cigarette vending machines where a procession of minors repetitively could purchase cigarettes. This would mean that the General Assembly intended that the only burdens, state and local, on the owner of a properly labeled vending machine would be to keep it stocked and to collect the sales proceeds. I do not attribute so cynical a purpose to the General Assembly.

Chief Judge MURPHY has authorized me to state that he joins in the views expressed in this dissenting opinion.