GEORGE W. COCHRAN CO., INC. *v.* COMP-
TROLLER OF THE TREASURY, ALCOHOL
AND TOBACCO TAX DIVISION

[No. 150, September Term, 1980.]

*Decided November 24, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Ronald A. Schechter,* with whom were *David T. Austern* and *Goldfarb, Singer & Austern* and *Jayson Amster* on the brief, for appellant.

*Amicus curiae* brief of The Maryland Tobacco and Candy Distributors Association filed by *Paul T. McHenry, Jr.*

*Mark D. Gately* and *Gerald Langbaum, Assistant Attorneys General,* with whom were *Stephen H. Sachs, Attorney General,* and *Charles O. Monk, II* and *Naomi F. Samet, Assistant Attorneys General,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

The principal question presented in this case is whether the Maryland Unfair Cigarette Sales Act, Maryland Code (1975), § 11-501, *et seq.,* of the Commercial Law Article is valid in light of the state action exception to § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.[1]

---

**1.** Although petitioner has raised other questions in this case, the challenge to the validity of the Unfair Cigarette Sales Act is grounded solely upon the argument that it conflicts with § 1 of the Sherman Act. No other issues relating to the statute's validity are raised.

In 1956, the Maryland Legislature found that cigarettes were being used by merchants as loss leaders with the intent "to deceive the public," and that such practices were "unfair, deceptive, destructive and unethical [and have] been and [are] . . . fostering monopoly and high prices by tending to force independent wholesalers and retailers out of business." Ch. 90 of the Acts of 1956. In order to remedy the situation, the Legislature enacted the Unfair Cigarette Sales Act. The statute, *inter alia,* prohibits the sale by a wholesaler or retailer of cigarettes below cost if the sale is made with the "intent to injure a competitor or to destroy or substantially lessen competition," although proof of sales below cost is prima facie evidence of such intent. §§ 11-504 (a) and 11-506 (a). The act also prohibits a retailer from purchasing cigarettes from a wholesaler at a cost "which directly or indirectly is less than the cost to the wholesaler by any means . . . ." § 11-504 (b).

The act itself is a comprehensive legislative scheme regulating the sale of cigarettes in the State. Section 11-501, containing definitions, specifies that the phrase "cost to the wholesaler" means the total of the basic cost of the cigarettes (defined in § 11-501 (b) as the lesser of the invoice or replacement cost, plus freight charges not included in the invoice or replacement cost, minus any discounts), plus "a markup to cover [the merchant's] cost of doing business," which includes costs of delivery to the retailer and taxes payable by the wholesaler. The section further states that "[i]n the absence of satisfactory proof of a lesser cost, [the total cost of doing business] is presumed to be five percent of the basic cost of cigarettes to him." § 11-501 (e) (1) (ii). As prices of cigarettes are changed by manufacturers, the Alcohol and Tobacco Tax Division of the State Comptroller's office issues price lists which include calculations employing this legislatively mandated formula, to determine the presumed minimum permissible sales prices under the act.

The State Comptroller is charged with enforcement of the statute. Section 11-507 allows him to employ inspectors to assist in enforcement, and grants him rule-making authority as well. Section 11-508, however, allows private parties

as well as the Comptroller to seek injunctions and/or damages and costs in order to enforce the act. The Comptroller may also suspend or revoke a cigarette vendor's license on the finding of a violation.[2]

Turning to the facts of the present case, the Comptroller's office advised Cochran, a Virginia corporation licensed as a Maryland cigarette wholesaler, that an investigation had shown numerous sales below cost of cigarettes by Cochran in violation of § 11-504, and that an administrative hearing would be held at which Cochran could show cause why its license should not be revoked. At the hearing, Cochran stipulated to having made 35 sales of cigarettes at prices below the statutorily prescribed minimum, but claimed that it had cut its prices in order to meet those of its competitors. Under § 11-502 (a) (5), a wholesaler may sell below cost in order to meet his competition if the prices charged by the competition are themselves lawful. The hearing officer rejected this defense based on his conclusions that Cochran's competitors' prices were not lawful and hence, that Cochran's conduct in cutting prices to meet those of his competitors did not fall within § 11-502 (a) (5). The hearing officer ordered Cochran's license to be suspended for 20 days.

On appeal to the Circuit Court for Charles County, Judge Bowling, in an extensive and well-reasoned opinion, affirmed the administrative ruling including the 20-day suspension. With regard to Cochran's primary arguments, the circuit court concluded that the Maryland Unfair Cigarette Sales Act was not a price fixing scheme in conflict with § 1 of the Sherman Act, but that even if it were, the Maryland statute would fall within the state action exception to the Sherman Act set forth in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. Cochran appealed to the Court of Special Appeals, and this Court

---

2. Other sections of the act include an enumeration of sales to which the act is not applicable (§ 11-502), special cost provisions distinguishing, *inter alia,* between credit and cash and carry sales (§ 11-503), prohibitions of combination sales and concessions (§ 11-505), etc., which though not pertinent to this case per se, nonetheless reflect the comprehensive nature of the state's regulatory scheme with regard to cigarette sales.

issued a writ of certiorari prior to argument in the Court of Special Appeals.

In addressing Cochran's argument that the Maryland Cigarette Unfair Sales Act is invalid under § 1 of the Sherman Act, we shall assume, arguendo, that the state statute would conflict with the Sherman Act if it were not for the state action exception recognized in *Parker v. Brown, supra.*[3] *Parker v. Brown* upheld a California statute which authorized "the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities." *Parker v. Brown, supra,* 317 U.S. at 346. Petitioners in *Parker* claimed that the California statute was invalid under the Sherman Act. In rejecting the challenge, the Supreme Court in an opinion by Chief Justice Stone stated (*id.* at 350-351):

> "But it is plain that the [California] prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."

And later the court reiterated (*id.* at 351):

> "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state."

---

**3.** A few cases have indicated that below-cost sales acts do not violate the Sherman Act, irrespective of any state action immunity. Baseline Liquors v. Circle K Corp., 129 Ariz. 215, 630 P.2d 38 (Ariz. App. 1981); Rice v. Alcoholic Beverage Control Appeals Board, 21 Cal.3d 431, 458, 146 Cal.Rptr. 585, 579 P.2d 476 (1978); Serlin Wine and Spirit Merchants, Inc. v. Healy, 512 F.Supp. 936 (D.Conn. 1981). But *cf.* the discussion in Cohen v. Frey & Son, Inc., 197 Md. 586, 602-603, 80 A.2d 267 (1951).

The Supreme Court noted that a state may not validly "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Ibid.* However, that was not what California had attempted to do. Rather, the

> "state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." (*Id.* at 352).

In subsequent cases involving the question of whether a particular scheme falls within the state action exception to the Sherman Act, the court, following the rationale in *Parker,* focused on the nature and the extent of state involvement in the restraints. In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court struck down a minimum fee schedule propounded by a county bar association and enforced by the Virginia State Bar because the Court found that the anticompetitive activities involved had not been "compelled by direction of the State acting as a sovereign." 421 U.S. at 791. The Court went on to say that simply because the State Bar was a state agency "for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." *Ibid.*

The *Goldfarb* case is to be contrasted with *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), involving restraints mandated by rules promulgated by the Supreme Court of Arizona on lawyers' advertising. There the United States Supreme Court held that the anticompetitive activities fell within the state action exception to Sherman Act since they were " 'compelled by the direction of the State acting as a sovereign,' " 433 U.S. at 360, *quoting Goldfarb, supra,* 421 U.S. at 791, through the aegis of its Supreme Court — the "ultimate body wielding

the State's power over the practice of law," *Bates, supra,* 433 U.S. at 360.

In *Bates,* the court distinguished a case decided a year earlier, *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), which had found that a utility's activities in giving away light bulbs were not immune from antitrust attack on the ground that the giveaway program was embodied in a tariff approved by a state regulatory commission and hence constituted state action. The Court emphasized that in *Cantor,* the program "was instigated by the utility with only the acquiescence of the state" and the state's "incorporation of the program into the tariff reflected its conclusion that the utility was authorized to employ the practice if it so desired." *Bates, supra,* 433 U.S. at 362.

In *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the most recent Supreme Court decision concerning state action and the Sherman Act, the Court utilized a two part test for antitrust immunity under *Parker v. Brown.* The Court stated (445 U.S. at 105):

> "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)."

*Midcal* involved a California statute which required all wine producers, wholesalers and rectifiers to enter into and file with the state fair trade contracts and resale price schedules. The parties were forbidden by the statute from selling wine at prices other than those in the agreements and schedules. The state had no control over the prices, however, and its involvement in the scheme was limited to enforcement. The Court held that while the restraints met the first part of the test there utilized (the statute was a forthright statement of the clear purpose of the California legislature to permit price maintenance), the state program did not meet the second

part of the test because the state "simply authorizes price-setting and enforces the prices established by private parties." *Ibid.*

The Maryland Unfair Cigarette Sales Act meets the standards for state action set forth in the above-discussed cases. The statute embodies "a clearly articulated and affirmatively expressed" state policy. *Midcal, supra,* 445 U.S. at 105. The preamble of the act reads in pertinent part (Ch. 90 of the Acts of 1956):

> "Whereas, cigarettes, because of their standardized character, their great popularity, their widespread and varied types of markets and methods of distribution and the sensitivity of their distribution to price fluctuations, are particularly susceptible to use as "bait" or "loss leaders" to deceive the public; and
>
> Whereas, the advertising, offering to sell, or sale of cigarettes below cost with the intent of injuring a competitor or competitors, or of substantially lessening or destroying competition, is an unfair, deceptive, destructive and unethical business practice, which has been and is demoralizing and disorganizing the distribution of cigarettes, and fostering monopoly and high prices by tending to force independent wholesalers and retailers out of business; and
>
> Whereas, the distinctive character of cigarettes and the economic facts and circumstances peculiar to their distribution require special and individualized treatment of the problems created by advertising, offering and selling cigarettes below cost; and
>
> Whereas, the public welfare will be promoted by the prohibition of such practices in the distribution of cigarettes and the effective enforcement of such prohibition; . . . ."

In the judgment of the Maryland Legislature, the sale of cigarettes below cost is perpetuated by merchants in order to

deceive the public, to intentionally destroy competition, and is an unethical business practice having demoralizing and disorganizing effects on the business of distributing cigarettes. The Legislature also stated its belief that the "economic facts and circumstances peculiar to" the distribution of cigarettes require "special and individualized treatment" and that the welfare of the public would be promoted by the restraints in the bill. The Legislature has certainly articulated that it is against Maryland public policy to permit below-cost sales of cigarettes and that such sales are to be restricted. This policy, expressly set forth in the preamble, is further articulated in the operative portions of the statute.

The most critical factor in deciding whether a state statute comes within the state action exception would appear to be the manner in which the state policy is asserted or the nature of the state involvement. The Maryland Unfair Cigarette Sales Act, unlike the state activities involved in *Midcal, Cantor* and *Goldfarb,* is not simply an authorization for private parties to engage in price-fixing arrangements and is not merely an enforcement mechanism for the prices agreed upon by private parties. The Maryland statute directly imposes its requirements upon cigarette wholesalers and retailers without regard to any agreements or arrangements which might or might not exist among those private businesses. Any possible private agreements are irrelevant; the act operates entirely independently of them. The challenged "restraints of trade" are "compelled by the direction of the State acting as a sovereign." *Bates,* 433 U.S. at 360; *Goldfarb,* 421 U.S. at 791. Although private actions for violations of the statute are permitted, nevertheless the State Comptroller administers the statute, is charged with the duty of enforcing it, employs inspectors to that end, and may seek a variety of remedies to enforce the act. Thus, the legislative policy is " 'actively supervised' by the State itself." *Midcal, supra,* 445 U.S. at 105.

We hold, therefore, that in light of the state action exception to the Sherman Act, the Maryland Unfair Cigarette Sales Act does not conflict with § 1 of the federal statute.

12

In addition to challenging the validity of the Maryland statute, the appellant Cochran claims that the circuit court erred in certain other respects. However, we have examined the record and find no reversible error.[4]

*Judgment of the Circuit Court for Charles County affirmed. Appellant to pay costs.*

---

4. Specifically, we believe that there was sufficient evidence in the record to support the finding that Cochran cut its prices to meet those of its competition knowing that the competitor's prices were unlawful under the act. This knowledge precludes any defense under § 11-502 (a) (5).

We also agree with the hearing officer and Judge Bowling that Cochran failed to rebut the statutory presumption (§ 11-506) making proof of a sale below cost prima facie evidence of the intent to injure a competitor or to destroy or substantially lessen competition, which is required by § 11-504 in order to find a violation of the Act. Cochran stipulated to thirty-five sales below cost. Its only evidence that those sales were made in good faith was the testimony of Cochran's president — the very person who, as a matter of company policy, authorized the prohibited sales, knowing that the prices he was meeting were themselves illegal. We cannot say that the hearing officer erred in concluding that this testimony was insufficient to rebut the statutory presumption.

If Cochran in good faith wanted to meet the prices of its competition, and if it knew those prices to be illegal, the statute gives it the opportunity to seek an injunction against the cut-rate, illegal sales. § 11-508(a). The act does not, however, authorize Cochran, or any other wholesaler, to violate the statute simply because the competition is doing so.