Dear Delegate Barve:
You have requested an opinion as to whether Maryland's system of wholesale wine and liquor price regulation would withstand a challenge under the antitrust laws. In 1952, the Court of Appeals of Maryland answered that question in the affirmative. Nearly a half-century later, there is some question whether the Court of Appeals — or a federal court — would reach the same conclusion.
To respond to your inquiry, we must answer three questions:
1. Do the wholesale pricing provisions of the State liquor law mandate or authorize conduct that violates the antitrust laws?
2. Does the State regulatory system avoid preemption by the federal antitrust laws because it is "state action" and therefore excepted from the antitrust laws under the "state action immunity doctrine"?
3. Does the State's right under the Twenty-first Amendment to regulate the distribution and sale of alcoholic beverages outweigh application of the antitrust laws?
For the reasons outlined below, it is our opinion that:
1. The wholesale pricing provisions of the State liquor law prohibit price discrimination and require wholesalers each month to post and maintain prices for all brands and sizes of liquor and wines. The proscription against price discrimination is compatible with federal antitrust law and likely to withstand any challenge. Although there are well-respected legal authorities on both sides of the question, the requirement that wholesalers post prices and not deviate from those prices for a month remains defensible under current antitrust analysis.
2. The state action immunity doctrine provides a second line of defense for the law only if the Alcohol and Tobacco Tax Unit of the State Comptroller's Office actively supervises the price posting and adherence provisions of the law. Whether the supervision exercised by the Comptroller's Office is deemed adequate may depend upon the choice a reviewing court makes between two conflicting approaches in the case law. Some recent cases suggest that the supervision exercised by the Comptroller's Office could never be adequate because the statute does not permit the Comptroller to review the reasonableness of prices.
3. A court may find that the State's expressed interest in promoting temperance and small business at the expense of price competition in the wholesale alcoholic beverage industry outweighs the general interest in free competition expressed in the federal antitrust laws.
Thus, in our opinion, the wholesale pricing system established in the State liquor law is defensible and this Office stands ready to defend the law against an antitrust challenge as is our obligation.[1] However, if the General Assembly continues to favor the policies expressed in the wholesale pricing provisions, we recommend that a study be conducted to document that the law is effective in accomplishing its stated purposes.
 I State Liquor Law
A. Background
Following the repeal of Prohibition with the passage of theTwenty-first Amendment to the United States Constitution in the early 1930's, the Maryland General Assembly enacted a comprehensive statute to control the marketing of alcoholic beverages in Maryland. Chapter 2, Laws of Maryland 1933 (Special Session). This statute has been amended several times and is now codified in Article 2B of the Maryland Code ("State liquor law").[2]
In 1943, the Legislature added a provision to the State liquor law to prohibit secret discounts and price discrimination by wholesalers of wine and liquors. It also authorized the Comptroller to promulgate regulations to carry out that purpose. Chapter 996, Laws of Maryland 1943. The avowed purpose of the amendment was to eliminate the "undue stimulation of the sale of alcoholic beverages" and the "disorderly distribution" of such products. Id. That provision is now codified in Article 2B, § 12-102(a). The Comptroller promulgated regulations that required wholesalers to file pricing schedules and any proposed price changes. In 1951, the Court of Appeals determined that the Comptroller's regulations exceeded the authority delegated by the statute because they tended to promote horizontal price-fixing, which the statute did not authorize. See Dundalk Liquor Co. v.Tawes, 197 Md. 446, 79 A.2d 525 (1951) ("Dundalk Liquor I").
In response to Dundalk Liquor I, the Legislature promptly amended the statute to provide the authorization that the Court of Appeals had found lacking. First, the Legislature added a general purpose section to the State liquor law that declared a policy to regulate alcoholic beverages in order "to obtain respect and obedience to law and to foster and promote temperance." Chapter 566, Laws of Maryland 1951. The amendment also stated that the Comptroller and other State and local officials were empowered to administer and enforce the State liquor law "for the protection, health, welfare and safety of the people of this State." Id. That general policy declaration is now codified in Article 2B, § 1-101(a).[3]
Second, the General Assembly authorized the Comptroller to fix maximum wholesale discounts (or prohibit discounts altogether), to require advance posting of wholesale prices and to require the adherence to those prices for a period of time. The legislation explicitly disclaimed any authority for the Comptroller to set wholesale prices himself. Chapter 711, Laws of Maryland 1951. That provision is now codified in Article 2B, § 12-103. The legislation reiterated the intention to promote temperance, to discourage price wars and price discrimination that would favor high-volume retailers, and generally to eliminate the undue stimulation of the sale of alcoholic beverages in the State. Id.[4]
The law was challenged once again on antitrust grounds. This time, the Court of Appeals accepted the stated purposes and upheld the amended law.[5] Dundalk Liquor Co. v. Tawes,201 Md. 58, 92 A.2d 560 (1952) ("Dundalk Liquor II"). A few years later, defendants in a criminal antitrust action in federal court attempted to use the amended law as a shield against prosecution. The federal district court noted that the wholesale pricing provisions of the State liquor law and the federal antitrust laws were in "direct conflict at certain points", but found that the crimes alleged in the indictment encompassed activities beyond those authorized by the State liquor law. Accordingly, the court did not reach the question of whether the State liquor law was preempted by the antitrust laws. United States v. Maryland StateLicensed Beverage Association, Inc., 138 F. Supp. 685, 701-2 (D. Md. 1956), rev'd on other grounds, 240 F.2d 420 (4th Cir. 1957).
In 1983, following a report from the Governor's Task Force on Local Government Antitrust Liability, the General Assembly amended a number of State statutes to declare a public interest in limiting or displacing economic competition in certain circumstances. Chapter 510, Laws of Maryland 1983. The general purpose of the amendments was to protect State and local government entities from liability under the federal antitrust laws by clearly stating a legislative purpose to displace competition. Id., Preamble. Included among the amendments was the addition of such language to the State liquor law. That provision is now codified at Art. 2B, § 1-101(b).[6]
During its 1998 session, the Legislature amended the proscription against price discrimination in § 12-102 to prohibit a supplier from conditioning discounts on the pricing policy of the retailer. Chapter 305, Laws of Maryland 1998 (codified as § 12-102(b)).
Thus, the State liquor law prohibits price discrimination by wholesalers and requires advance posting and adherence to posted prices by wholesalers. The statute repeatedly and emphatically asserts that its purpose is to promote temperance, to encourage respect for the law, and to prevent deceptive or "destructive" business practices. The Legislature has also clearly expressed its intention to displace or limit economic competition.
Apart from the 1983 reiteration of the policy to displace economic competition, the 1998 amendment, several technical amendments, and a recodification, the portion of the State liquor law regulating wholesale liquor pricing has changed little sinceDundalk Liquor II.[7]
B. Regulatory Scheme Enforced By Comptroller
As authorized by the statute, the State Comptroller has issued regulations that elaborate the policies set forth in the State liquor law. See COMAR 03.02.01.05. The regulatory scheme established in §§ 12-102 and 12-103 and related regulations requires all suppliers and wholesalers of alcoholic beverages to file forms with the Alcohol and Tobacco Tax Unit of the Comptroller's Office each month. On the forms, the seller must indicate all of its proposed prices for the following month, including all price changes and the price of any new item the wholesaler wishes to sell. COMAR 03.02.01.05B(2). Price changes and new items must be filed by the fifth of the month and amended schedules adding any additional new items are due by the thirteenth of the month. COMAR 03.02.01.05B-C. The prices become effective at the beginning of the following month. COMAR03.02.01.05B(2)(c). The sellers must adhere to their posted prices for the entire month; no discounting is permitted. COMAR03.02.01.05B(3).
The Alcohol and Tobacco Tax Unit reviews the price schedules filed by wholesalers and makes them available to the public, including other members of the industry. COMAR 03.02.01.05D. Wholesalers also notify retailers of any price changes and new items by mail or by publication in a trade magazine circulated among retailers. COMAR 03.02.01.05D(3).
Section 12-103(c) authorizes the Comptroller to postpone the effective date for proposed price decreases in order to allow other sellers to make similar price decreases. However, this provision is not currently utilized. In addition, in 1997 the Comptroller repealed the part of the price filing regulation that permitted the filing of amended price schedules to match a competitor's price. See 23:26 Maryland Register 1862, 1863 (December 20, 1996); 24:4 Maryland Register 290 (February 14, 1997) (revising COMAR 03.02.01.05C(3)-(4)).
We understand that, in addition to reviewing price schedules, the Unit conducts audits to ensure that posted prices are the actual prices charged. Large wholesalers are audited on an annual basis. The Unit also spot checks filed prices with advertised prices, ensuring that the advertised price is the same as the posted price. The Unit is also able to monitor pricing through complaints received from competing wholesalers and others concerning variations from posted prices and illegal discounts or free product. Finally, Unit staff also routinely handles isolated problems with filings or improper invoices.
As a result, prices tend to be uniform, the market is stabilized and wholesale discounting is prevented. Price wars and price discrimination at the wholesale level are discouraged, thereby achieving one major goal of the regulatory scheme.[8]
To our knowledge, the effect of the law on alcohol consumption has not been documented.
 II Antitrust Analysis of State Liquor Law
Although the wholesale price regulation provisions of the State liquor law are little changed since the Court of Appeals upheld them in 1952, the courts have developed and refined antitrust law in the interim. Accordingly, we must look beyond Dundalk LiquorII to assess this regulatory scheme under current antitrust analysis.
A. Possible Preemption of State Law by the Sherman Act 1. The Sherman Act
The federal antitrust laws promote competition by prohibiting agreements that unreasonably restrain trade. Section One of the Sherman Act provides in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.
15 U.S.C. § 1.[9] Some restraints are imposed unilaterally by government, some are agreed upon by private parties, and some are "hybrid" in that privately determined restraints are mandated and enforced by governmental entities. In determining whether particular conduct constitutes a violation of the Sherman Act, antitrust analysis first focuses on whether the conduct is considered a "per se" violation or is analyzed under the "rule of reason."
 2. Preemption: Per Se Violations and the Rule of Reason.
The Supreme Court has deemed some restraints, like price-fixing, unreasonable per se. See Dr. Miles Medical Co. v. John D. Park Sons Co., 220 U.S. 373 (1911). Per se violations of the antitrust laws are those "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5
(1958). Per se violations include price-fixing, whether by agreement of "horizontal" competitors operating at the same level in the chain of distribution or by imposition of a "vertical" resale price maintenance scheme by a manufacturer or distributor.
Other restraints are evaluated under the "rule of reason," which requires analysis of the affected markets, the impact of the restraint, and the procompetitive and anticompetitive consequences of the restraint. See Broadcast Music, Inc. v.Columbia Broadcasting System, Inc. 441 U.S. 1, 8 (1979). The "rule of reason" is used, for example, to evaluate joint ventures among competitors and non-price, vertical restrictions such as exclusive territory distribution agreements, and covenants not to compete.
A state law that mandates conduct in violation of the federal antitrust laws is subject to preemption by federal law under the Supremacy Clause. However, a state statute is not preempted simply because it may have an anticompetitive effect. Rice v.Norman Williams Co., 458 U.S. 654, 659 (1982). Rather, there must be an "irreconcilable conflict" between federal antitrust laws and the state regulatory scheme. Id. If a state statute mandates or authorizes conduct that necessarily constitutes aper se violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute, it is likely to be preempted. California Retail Liquor Dealers Assn. v.Midcal Aluminum, Inc., 445 U.S. 97 (1980) (statute mandating resale price maintenance in California wine industry preempted by the Sherman Act).
If the "rule of reason" applies to the activity mandated by the statute:
 The statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.
Rice, 458 U.S. at 661. In Rice, the Supreme Court upheld a California statute allowing manufacturers to establish exclusive distributors within the state. Because that law authorized vertical non-price agreements, which are lawful when reasonable, it was not preempted on its face by the Sherman Act. In other words, because the California statute did not necessarily mandate an antitrust violation in all cases, it could not be preempted without a detailed analysis of its actual effects as applied.
 3. Preemption: Unilateral and Hybrid Restraints.
Although the initial question under the antitrust laws is whether the challenged conduct constitutes a per se violation or should be analyzed under the rule of reason, there is a second, closely related question when government regulation is involved — i.e., whether the restraint on competition is unilaterally imposed by the government. In Fisher v. City ofBerkeley, 475 U.S. 260 (1986), the Supreme Court held that a municipal rent control ordinance was not preempted by § 1 of the Sherman Act because the city unilaterally established the maximum rents that could be charged. 475 U.S. at 267. Other than complying with the law, the private parties in Fisher had no discretion to agree upon or to "fix" maximum prices. The restraint was imposed unilaterally by the government on landlords who were compelled to obey the law and did not create a conspiracy among those subject to the law.
On the other hand, not all government-imposed restraints on private parties are deemed unilateral government action beyond the purview of the Sherman Act. As the Court noted in Fisher, "[c]ertain restraints may be characterized as `hybrid' in that nonmarket mechanisms merely enforce private marketing decisions."475 U.S. at 267-68. In such circumstances, the Court stated, "where private actors are thus granted a degree of private regulatory power, the regulatory scheme may be attacked under § 1 [of the Sherman Act]." Id.
To illustrate the concept of "hybrid restraints", the Court cited two of its prior decisions preempting state regulation of liquor pricing. In both cases, states had mandated and enforced resale price maintenance regimes in which prices were determined by private parties. California Retail Liquor Dealers Assn. v.Midcal Aluminum, Inc., 445 U.S. 97 (1980); Schwegmann Bros. v.Calvert Distillers Corp., 341 U.S. 384 (1951).
 4. Application to Maryland's Liquor Law
In several cases involving state laws that enforced resale price maintenance in the liquor industry, the Supreme Court has held that the Sherman Act preempted hybrid restraints embodied in those laws. See 324 Liquor Corp. v. Duffy, 479 U.S. 335
(1987); California Retail Liquor Dealers Assn. v. MidcalAluminum Inc., 445 U.S. 97 (1980); Schwegmann Bros. v. CalvertDistillers Corp., 341 U.S. 384 (1951). In each case, a state authorized private parties to set prices and the state enforced those prices. Thus, in each case, the restraints involved a regulatory scheme that enforced private pricing decisions and that resulted in a per se violation of the Sherman Act.
Unlike the statutes considered in those Supreme Court cases, the State liquor law does not mandate resale price maintenance, aper se violation of the antitrust laws. It does, however, impose two other types of restraints: (1) that wholesalers refrain from discriminating in price among retailers (§ 12-102); and (2) that wholesalers post prices and adhere to posted prices for a 30-day period (§ 12-103).
 a. Prohibition Against Price Discrimination in § 12-102
The prohibition against price discrimination is not inconsistent with the federal antitrust laws. Section 12-102 prohibits the granting of secret discounts, rebates, free goods and other inducements to selected purchasers and prohibits discrimination, direct or indirect, in price, discounts or quality of merchandise sold, among customers. Though somewhat more restrictive, this provision resembles the proscription against price discrimination in the federal Robinson-Patman Act.[10] In comparison to federal law, the State liquor law includes a broader anti-price discrimination provision by, in essence, eliminating certain exceptions available under the Robinson-Patman Act.[11] The State liquor law thus prohibits conduct that would be permissible under a federal antitrust statute.
State law may be more restrictive than federal law without being subject to preemption. See Exxon Corp. v. Governor ofMaryland, 437 U.S. 117 (1978). The Exxon case involved a challenge to a Maryland statute that required oil refiners to extend certain price reductions uniformly to all service stations that they supplied. Among other things, the plaintiff oil companies argued that the statute was preempted by the federal antitrust laws, citing a provision in the Robinson-Patman Act that permits localized price discrimination to meet a competitor's price. The Supreme Court held that Maryland's requirement that price reductions be extended uniformly was not preempted by the Sherman Act or the Robinson-Patman Act. Because a refiner could simultaneously comply with both federal law and the stricter mandates imposed by the State, there was no irreconcilable conflict that would justify preemption by federal law.
To the extent that the statute's prohibition against price discrimination could be viewed as a ban on discounting, a perse violation if the result of private agreement,[12]
§ 12-102 imposes a unilateral restraint on competition analogous to the rent ceiling imposed by the municipal ordinance upheld inFisher v. City of Berkeley.
In sum, the anti-price discrimination provision in § 12-102
faces no significant challenge under the antitrust laws.[13]
 b. Price Posting and Adherence Required by § 12-103
There is a split of opinion in the federal courts with respect to whether the price posting and adherence provisions in state liquor laws mandate a per se violation of the antitrust laws. Statutes and regulations similar to Maryland's law have been challenged in New York, Oregon, and Massachusetts with inconsistent results. The courts have apparently arrived at these divergent results in part by ignoring contrary authority. On one side of the debate is an eminent appellate judge; on the other is the leading academic treatise on antitrust analysis and the most recent lower court decisions.
A mandate to post prices essentially permits competitors to exchange price data. The mere exchange of price data is not aper se violation of the Sherman Act. United States v.United States Gypsum Co. 438 U.S. 422, 441, n. 16 (1978). But an agreement to adhere to previously announced prices has been deemed a per se violation. See Catalano, Inc. v. Target Sales,Inc., 446 U.S. 643, 647 (1980); Sugar Institute v.United States, 297 U.S. 553, 601-2 (1936). In Sugar Institute, the Court held that an agreement to adhere to previously announced prices and terms of sale is unlawful per se under the Sherman Act, even though the particular prices and terms were not themselves fixed by private agreement. Sugar Institute,297 U.S. at 601-2. Following the reasoning of Sugar Institute, the Court in Catalano held that an agreement among competing wholesalers to refuse to sell to retailers on credit is per se
illegal under the Sherman Act. Catalano, 446 U.S. at 648.
Without explicitly distinguishing Catalano or SugarInstitute the Second Circuit upheld a New York statute mandating adherence to posted prices. The New York statute required liquor wholesalers to post and adhere to their own unilaterally determined prices, much as the Maryland law does. In Battipagliav. New York State Liquor Authority, 745 F.2d 166 (2d Cir. 1984),cert. denied, 470 U.S. 1027 (1985), the Second Circuit held that this regulatory scheme did not constitute a per se violation of the Sherman Act. In the majority opinion in that case, Judge Friendly argued that the statute essentially compelled the exchange of price information. Since the Supreme Court has not held the exchange of price information to be a perse violation of the antitrust laws, he reasoned, the statute would not be preempted under the Supreme Court holding in Rice. Judge Friendly also observed that state-mandated compulsion of individual action is the antithesis of an agreement. He went on to hold that a state statute is not preempted by the Sherman Act simply because a private party's compliance might cause him to violate the antitrust laws or because the state scheme might have an anticompetitive effect. 745 F.2d at 173-74.
Judge Ralph Winter, in a colorful dissent, argued that New York's legislation requiring adherence to announced prices mandated a price-fixing cartel — a per se violation of the antitrust laws. He dismissed as a "quaint fiction" the law's asserted purpose to promote temperance: "its self-evident purpose is not to protect the public from the evils of the demon rum, but to preserve the high standard of living of those who sell it."745 F.2d at 179-80.
Oregon had a liquor pricing policy that: (1) prohibited quantity discounts; (2) required price posting; (3) required that prices remain effective for specified periods of time; and (4) required posted prices to be delivered prices, regardless of transportation costs. In Miller v. Hedlund, 813 F.2d 1344,1349-51 (9th Cir. 1987), cert. denied, 484 U.S. 1061 (1988), the Ninth Circuit found that this regulatory scheme was a hybrid restraint that resulted in a per se violation of the Sherman Act. Seemingly unaware of Battipaglia, the Ninth Circuit neither cited nor distinguished the prior contrary decision in the Second Circuit. The leading commentary on antitrust analysis suggests that the Ninth Circuit decision and the dissent inBattipaglia are more consistent with Midcal and other Supreme Court cases. See P.E. Areeda H. Hovenkamp, Antitrust Law
¶ 217 at 310-12 (1997).
In the most recent case, the federal district court in Massachusetts agreed with the reasoning of the majority inMiller, and the dissent in Battipaglia. The court held that a Massachusetts liquor law requiring price posting and adherence to posted prices involved a hybrid restraint that resulted in a perse violation of the Sherman Act. Canterbury Liquors Pantry v.Sullivan, 16 F. Supp.2d 41 (D. Mass. 1998), app. dism'd subnom. Sea Shore Corp. v. Sullivan, No. 98-1317 (1st Cir. Oct. 20, 1998). The court was careful to note that it was the coupling of the requirements that wholesalers post prices and then adhere to posted prices for a period of time that offended the Sherman Act and not merely the exchange of price information. See alsoCanterbury Liquors Pantry v. Sullivan, 999 F. Supp. 144 (D. Mass. 1998) (holding that price posting portion of regulations not severable from invalid adherence provisions).
Judge Friendly's analysis upholding a similar New York statute would likely be accorded careful attention by any court reviewing the Maryland law and provides a basis for defending the wholesale price provisions of the State liquor law. On the other hand, there is a significant possibility that a court would follow the more recent case law to find that the price posting and adherence provision of the State liquor law is a hybrid restraint that results in a per se violation of the Sherman Act — i.e., that the State liquor law mandates action by private parties that would constitute price-fixing if undertaken without statutory compulsion. The fact that the restraint was mandated by law and not the result of collusion between private parties is irrelevant from this viewpoint. The anticompetitive impact is the same: stabilization of prices in a range set by private actors. However, even if a court were persuaded by this argument, this would not end the inquiry.
B. The State Action Immunity Doctrine
Whether Maryland's wholesale liquor pricing law mandates a perse violation of the antitrust laws is not dispositive of the preemption issue. Even a state regulatory system that mandates aper se violation of the Sherman Act may avoid preemption under the "state action immunity doctrine."
Under the state action immunity doctrine, the Sherman Act may be inapplicable to the anticompetitive activity of a state acting through its legislature or its highest court. See Parker v.Brown, 317 U.S. 341 (1943). In Dundalk Liquor II, the Court of Appeals relied in part on the state action immunity doctrine to uphold the wholesale pricing provisions of the State liquor law against an antitrust challenge. Dundalk Liquor II,201 Md. at 68-69. However, in the intervening half-century, the Supreme Court has elaborated and qualified that doctrine.
The key elements of the current analysis were established inCalifornia Retail Liquor Dealers Assn. v. Midcal Aluminum,Inc., 445 U.S. 97 (1980). In that case, the Court set forth two conditions for application of the doctrine:
 1. The challenged restraint must be one clearly articulated and affirmatively expressed as state policy; and
2. The policy must be actively supervised by the state.
Midcal, 445 U.S. at 105.
 1. Clear Articulation of State Policy.
In our opinion, Maryland's law easily passes the first part of this test. The General Assembly expressly mandated the price posting and adherence system and authorized the Comptroller to prohibit or limit discounting "[i]n order to eliminate the undue stimulation of the sale of alcoholic beverages" and "for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law." Article 2B, §§ 12-102, 12-103. The Legislature expressed its intent to foster and promote temperance "notwithstanding any anticompetitive effect." Id., § 1-101(a)(1) and (b)(2). Indeed, the predecessors to §§ 1-101(a) and 12-103 were added to the law in response to a Court of Appeals decision that found insufficient legislative authorization to displace competition. And, if this intention were not already evident, the preamble to the 1983 bill that added the language of § 1-101(b) about displacing competition made clear that it was designed to satisfy this part of the state action immunity doctrine. Chapter 510, Preamble, Laws of Maryland 1983. Compare George W. Cochran Co.,Inc. v. Comptroller, 292 Md. 3, 10-11, 437 A.2d 194 (1981) (General Assembly clearly stated policy to displace competition in Unfair Cigarette Sales Act) with Anheuser-Busch, Inc. v.Goodman, 745 F. Supp. 1048, 1051-52 (M.D. Pa. 1990) (broad grant of regulatory policy to liquor control board failed to express anti-competitive policy).
 2. Active State Supervision
The second part of the Midcal test requires that the anticompetitive activity at issue be actively supervised by the state. Midcal, 445 U.S. at 105. The State must exercise sufficient independent judgment and control to make the anticompetitive activity the product of deliberate state intervention. In an antitrust challenge to the State Unfair Cigarette Sales Act, the Court of Appeals held that the regulatory scheme enforced by the Comptroller satisfied this part of the Midcal test because "the Comptroller administers the statute, is charged with the duty of enforcing it, employs inspectors to that end, and may seek a variety of remedies to enforce the act." George W. Cochran Co., Inc. v. Comptroller,292 Md. 3, 11, 437 A.2d 194 (1981). However, the Supreme Court has subsequently stated that the mere potential for supervision is inadequate; there must be active supervision in fact. See FTCv. Ticor Title Ins. Co., 504 U.S. 621 (1992).
No matter how clear the State policy to displace competition, the State must actively regulate the anticompetitive practices if the statute is to avoid preemption through the state action immunity doctrine. For example, in 324 Liquor Corp. v. Duffy,479 U.S. 335 (1987), the Court found that while the New York state legislature had clearly adopted a policy of resale price maintenance for the liquor industry, the state itself did not establish prices, review the reasonableness of price schedules, monitor market conditions, or otherwise supervise pricing decisions. The Court concluded that "[t]he State has displaced competition among liquor retailers without substituting an adequate system of regulation." 479 U.S. at 345.
Maryland's scheme of liquor regulation set out in the state liquor law is distinguishable from two state liquor laws invalidated by the Supreme Court. Unlike the California regulatory scheme in Midcal that required that a single fair trade contract or pricing schedule set the terms for all wholesale transactions in that brand in that area,445 U.S. at 99, Maryland law permits wholesalers to set their own prices.
Similarly, the New York statute struck down in Duffy required liquor retailers to charge at least 112% of wholesalers' posted prices, and did not provide for review of those prices by the State. Maryland's statute does not allow wholesalers to dictate retail prices.
Rather, the State liquor law requires wholesale prices to be published in advance and adhered to for a month. The Comptroller's Office ensures that these prices are posted in a timely manner and that the prices posted are the prices charged. The fact that the Comptroller's Office actively reviews the price posting and price maintenance by liquor suppliers and wholesalers ensures that prices for alcoholic beverages remain stable and discrimination among buyers is prevented, one of the statute's goals. Because the State liquor law does not purport to facilitate horizontal price-fixing by private parties, but rather to stabilize prices and prevent price wars, the Comptroller has no authority to review the reasonableness of the prices. Indeed, the statute expressly forbids such action. § 12-103(e).
In Battipaglia, Judge Friendly suggested that the degree of supervision required of a state depended upon the nature of the restraint imposed by the regulatory system. Thus, greater supervision of pricing may be required in a regulatory system that imposes minimum resale prices than in a system that simply seeks to prevent price discrimination. In the latter type of system — the type established by the Maryland law — "there is nothing that the state can `actively supervise' except to see that the statutory requirements are obeyed." 745 F.2d at 176.See also Ticor, 504 U.S. at 639-40 (depending upon type of regulation, state may provide comprehensive supervision without complete control); Duffy, 479 U.S. at 344 n. 6 (statute specifying the margin between wholesale and retail prices may satisfy active supervision requirement).
However, the more recent court decisions suggest that a state must oversee the reasonableness of prices generated under a price posting and adherence system. Under these cases, because theeffect of the statute is to achieve price stabilization at levels set by private parties, such activity is not immune from application of the antitrust laws. From that perspective, the absence of statutory authority to review or revise prices means that the statute is doomed to fail the active supervision test.See Miller, 813 F.2d at 1351; Canterbury Liquors,16 F. Supp.2d at 50-51; Anheuser-Busch, 745 F. Supp. at 1052-54.
Once again, if attacked under the antitrust laws, the Maryland statute is likely to survive under the state action immunity doctrine only if the reviewing court prefers the analysis of Judge Friendly in Battipaglia to that of the more recent cases. In either case, the statute may still be upheld if the federal interest in free competition is outweighed by the State interests protected by the Twenty-first Amendment.
 III The Twenty-First Amendment
Finally, any application of federal law to state regulation of the sale of alcoholic beverages must take account of theTwenty-first Amendment to the United States Constitution. TheTwenty-first Amendment not only repealed Prohibition, but also reserved to each state the power to regulate, or prohibit entirely, the transportation or importation of liquor in that state.[14]
In Dundalk Liquor II, the Court of Appeals relied upon the concurring opinion of Justice Frankfurter in United States v.Frankfort Distilleries, 324 U.S. 293 (1945), to hold that the Commerce Clause — and legislation enacted under it such as the Sherman Act — was subordinate to the exercise of state power under the Twenty-first Amendment. Dundalk Liquor II,210 Md. at 67-68. However, Justice Frankfurter's approach in FrankfortDistilleries has become the minority view on the Court. SeeDuffy 479 U.S. at 358-59. (O'Connor, J., dissenting). Subsequent decisions of the Supreme Court teach that "there is no bright line between federal and state powers over liquor" and that state "controls may be subject to federal commerce power in appropriate situations." Midcal, 445 U.S. at 110. The state power under theTwenty-first Amendment must be harmonized with congressional authority under the Commerce Clause to enact legislation such as the Sherman Act. Midcal, 445 U.S. at 109.
The interests of the State in regulating the liquor industry must be balanced against the federal interest implicated — in this case, the interest in promoting competition. The Supreme Court has stated that the Twenty-first Amendment shields challenged state legislation when the interests implicated by the state law are closely related to the powers reserved by theTwenty-first Amendment. Duffy, 479 U.S. at 347. State legislation may prevail even if its requirements directly conflict with express federal policies. See Bacchus Imports,Ltd. v. Dias, 468 U.S. 263, 275-76 (1984); but cf. 44Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996) (disavowing suggestion in prior decision thatTwenty-first Amendment limited application of First Amendment to states).
The federal interest articulated in the Sherman Act is substantial. Competition lies at the foundation of our free enterprise system and results in better products and lower prices for consumers. However, balanced against this general federal interest, Maryland's longstanding interests in eliminating the undue stimulation of the sale of alcoholic beverages, promoting temperance, preventing price wars and prohibiting price discrimination in favor of high volume dealers, are arguably even stronger.
There are apparently no current studies that assess the effectiveness of the statute in achieving its goals. The State was not required to demonstrate its effectiveness when the statute was previously challenged. In upholding the statute nearly 50 years ago, the Court of Appeals commented that the State had no "burden of proof to show conclusively (or preponderantly) that the means adopted are reasonably necessary and appropriate" for the accomplishment of its legislative objective. Dundalk Liquor II, 201 Md. at 71.
Recent Supreme Court decisions have demanded more of a showing to support the avowed state interest at stake. In Midcal, the Supreme Court noted that California courts had cast doubt on the efficacy of resale price maintenance to accomplish the law's stated purpose to promote temperance and to protect small business. Midcal, 445 U.S. at 111-14. The Court concluded that:
 We need not consider whether the legitimate state interests in temperance and the protection of small retailers ever could prevail against the undoubted federal interest in a competitive economy. The unsubstantiated state concerns put forward in this case simply are not of the same stature as the goals of the Sherman Act.
Midcal, 445 U.S. at 113-14. Similarly, in Duffy, the Court agreed that the purpose of the resale price maintenance sanctioned by the New York statute was to protect small retailers. Nonetheless, given the absence of legislative or other findings that it was effective, the Court concluded that the state interest was less substantial than the federal interest in enforcement of the antitrust laws. Duffy, 479 U.S. at 350-51.
Unlike the California courts, the State courts in Maryland have not disclaimed the purposes asserted in the State liquor law. Moreover, the statute contains several legislative endorsements of the need for the wholesale price regulation to encourage temperance and to preserve orderly markets. Nevertheless, as a prophylactic measure, the General Assembly might commission a study of the law and its practical effects to determine whether the law should be repealed or modified. If such a study confirms that the law achieves its goals, it will bolster the defense of the law under the Twenty-first Amendment, should it be challenged. Cf. Maryland Highway Contractors Ass'n v.Maryland, 933 F.2d 1246, 1249 (4th Cir.), cert. denied,502 U.S. 939 (1991) (rejecting challenge to minority business enterprise law on other grounds, but noting State study documenting discrimination to support legislative findings underlying law). If the study raises doubt about the efficacy of liquor price regulation, it may help direct the Legislature's attention to appropriate amendments or repeal.
 IV Conclusion
In summary, we conclude as follows:
1. The State liquor law and the related regulations governing wholesale liquor pricing and distribution in Maryland prohibit price discrimination and require wholesalers each month to post and maintain prices for all brands and sizes of liquor and wines. The portion of the State liquor law that proscribes price discrimination is compatible with federal antitrust law and likely to withstand any challenge. Although there are well-respected legal authorities on both sides of the question, the requirement that wholesalers post prices and not deviate from those prices for a month remains defensible under current antitrust analysis.
2. Although the State has expressly articulated its policy to supplant competition with regulation in the wholesale liquor industry and supervises private parties' compliance with that pricing regulation, such supervision may not be sufficient under the state action immunity doctrine. Whether the supervision exercised by the Alcohol and Tobacco Tax Unit of the State Comptroller's Office is deemed adequate may depend upon the choice a reviewing court makes between two conflicting approaches in the case law. Some recent cases suggest that the supervision exercised by the Comptroller's Office could never be adequate because the statute does not permit the Comptroller to review the reasonableness of prices.
3. Under the Twenty-first Amendment, the State liquor law may survive a preemption challenge because the interests of the State in promoting temperance, prohibiting price wars and price discrimination in favor of high-volume retailers and eliminating undue stimulation of sales of alcoholic beverages outweigh the federal interest in promoting competition in the wholesale liquor industry. The State's interests and the legislative findings expressing those interests are more likely to prevail if the State can document the effectiveness of the statute in accomplishing its objectives.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Ellen S. Cooper Assistant Attorney General
 Meredyth Smith Andrus Assistant Attorney General
_________________________ Robert N. McDonald Chief Counsel Opinions and Advice
ANTITRUST — ALCOHOLIC BEVERAGES — STATE LAW REGULATINGWHOLESALE PRICING OF WINE AND LIQUOR DEFENSIBLE UNDER ANTITRUSTLAWS AND TWENTY-FIRST AMENDMENT
[1] See State ex rel. Attorney General v. Burning Tree Club,Inc., 301 Md. 9, 36-37, 481 A.2d 785 (1984).
[2] Article 2B includes a broad range of provisions dealing with alcoholic beverages, including licensing of manufacturers, distributors, and retailers, local liquor boards and licenses, beer franchise regulation, and local control over the sale of alcoholic beverages. Regulation of wholesale pricing of wine and liquor appears in Title 12.
[3] That provision states, in pertinent part:
 (a)(1) It is the policy of the State of Maryland that it is necessary to regulate and control the manufacture, sale, distribution, transportation and storage of alcoholic beverages within this State and the transportation and distribution of alcoholic beverages into and out of this State to obtain respect and obedience to law and to foster and promote temperance.
. . .
 (3) The restrictions, regulations, provisions and penalties contained in this article are for the protection, health, welfare and safety of the people of this State.
Article 2B, § 1-101(a) (emphasis added).
[4] The language has remained essentially unchanged since 1951:
 It is the declared policy of this State that it is necessary to regulate and control the sale and distribution within the State of wines and liquors, for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars, which unduly stimulate the sale and consumption of wines and liquors and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of wines and liquors should be subjected to the following restrictions, prohibitions and regulations. The necessity for the enactment of the provisions of this section is, therefore, declared as a matter of legislative determination.
Article 2B, § 12-103(a) (emphasis added).
[5] In its opinion, the Court of Appeals held that there was no general right to engage in "free and open competition," observing that there was no Maryland counterpart to the Sherman Act and that the Sherman Act itself was "repealed pro tanto" by the Miller-Tydings Act. 201 Md. at 65. It is notable that, subsequent to this decision, the General Assembly enacted the Maryland Antitrust Act, Chapter 357, Laws of Maryland 1972 (now codified at Maryland Code, Commercial Law Article, § 11-201 et seq.) and Congress repealed the Miller-Tydings Act, 50 Stat. 693 (1937),repealed, 89 Stat. 801 (1976).
[6] That provision now reads:
 (b)(1) It continues to be the policy of this State to authorize the exercise of the powers and authority provided by this article for the purpose of displacing or limiting economic competition by regulating or engaging in the sale or distribution of alcoholic beverages or both in order to obtain respect and obedience to law, to foster and promote temperance, to prevent deceptive, destructive, and unethical business practices, and to promote the general welfare of its citizens by controlling the sale and distribution of alcoholic beverages.
 (2) The officials and agencies granted powers and authority by this article to regulate and engage in the alcoholic beverages industry may displace or limit economic competition by regulating and engaging in the sale or distribution of alcoholic beverages or both on an exclusive basis as provided in this article and may adopt and enforce regulations authorized by this article notwithstanding any anticompetitive effect.
Article 2B, § 1-101(b). (Emphasis added.)
[7] One other amendment to the law is likely invalid and no longer enforced. In 1967, the General Assembly amended the law to include a "price affirmation" provision after a Supreme Court decision upheld a New York price affirmation law. See Joseph E.Seagram Sons, Inc. v. Hostetter, 384 U.S. 35 (1966). Essentially, this provision authorized the Comptroller to require suppliers to affirm that the price they charge Maryland wholesalers is no higher than the price they charge elsewhere in the country. This provision is now contained in Article 2B, § 12-103(c-1). Twenty years later, the Supreme Court overruledSeagram. See Healy v. Beer Institute, 491 U.S. 324 (1989);Brown-Forman Distillers Corp. v. New York State LiquorAuthority, 476 U.S. 573 (1986). Shortly thereafter, the Comptroller repealed the price affirmation regulation that he had previously promulgated. See 17:11 Maryland Register 1348 (June 1, 1990); 17:15 Maryland Register 1853 (July 27, 1990) (repealing former COMAR 03.02.01.13).
[8] Of course, this portion of the regulatory scheme does not directly affect prices at the retail level. Retailers remain free to set their own prices and to offer such discounts and sale prices as they deem appropriate.
[9] In addition to the Sherman Act, 15 U.S.C. §§ 1-7, which prohibits monopolization and agreements that unreasonably restrain trade, the federal antitrust laws also include the Clayton Act, 15 U.S.C. §§ 12-27, which prohibits tying agreements and mergers that may lessen competition or tend to create a monopoly, and the Robinson-Patman Act, which amended the Clayton Act to prohibit price discrimination.
[10] Section 13(a) of the Robinson-Patman Act provides that it is unlawful:
 either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .
15 U.S.C. § 13(a).
[11] The Robinson-Patman Act, 15 U.S.C. § 13, allows for differentials in price based upon differences in cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are sold or delivered. It also permits a seller to meet competition in response to changing conditions affecting the market or marketability of the goods concerned.
[12] See Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643
(1980) (agreement among competing beer wholesalers on credit terms, an element affecting price, was unlawful per se).
[13] In your letter requesting this opinion, you referred to a bill that you had introduced during the 1998 session of the General Assembly that would have amended § 12-102 to permit wholesalers to offer volume discounts. See House Bill 896. With such an amendment, § 12-102 would more closely resemble the Robinson-Patman Act. However, as indicated in the body of this opinion, we believe that § 12-102 can be defended against a challenge under the federal antitrust laws even without such an amendment.
[14] Section Two of the Twenty-first Amendment provides:
 The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.
 *Page 27